[Crim. No. 16085.    Second Dist., Div. One.    Aug. 15, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. MICHAEL KEVIEN MORGAN, Defendant and Appellant.

Karl K. Ransom for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, Acting P. J.—This is an appeal from a judgment of conviction of involuntary manslaughter (§ 192 subd. 2, Pen. Code).

In an amended information filed in Los Angeles on December 5, 1967, defendant was charged in count I with murdering Philip Catalfamo on June 10, 1967, in count II with assault by means of force likely to produce great bodily injury (§ 245, Pen. Code) in that he did on June 10, 1967, so feloniously assault Philip Catalfamo. Defendant pleaded not guilty to each charge and in a trial before the court without a jury defendant was found guilty of involuntary manslaughter in violation of the provisions of section 192, subdivision 2, Penal Code, a lesser but necessarily included offense as charged in count I. Proceedings were suspended, defendant was placed on probation for three years on condition that he spend the first 90 days in the county jail and pay a fine of $1,000 pursuant to Government Code section 13964. A timely notice of appeal was filed. Execution of the sentence was ordered stayed pending appeal.

A résumé of some of the facts is as follows: Gloria Ramirez resided near 103d Street and Hickory Street in Los Angeles. At about 7:30 a.m. June 10, 1967, while she was at home she saw defendant who at that time was near the street area and talking to Lawrance Ramirez (the father of Gloria). Defendant was calling Mr. Ramirez names and saying "Why don't you fight me? You are not a man." Mr. Ramirez replied, "I don't want to have anything to do with you." Defendant later left and Mr. Ramirez got into his car and drove away. At about 8 a.m., Gloria Ramirez was inside her residence and saw Philip Catalfamo park his truck in front of the residence. When Catalfamo was getting out of the truck defendant pulled on the door thereof and asked: "Why don't you give me a ride home." Catalfamo replied, "I can't. I can't because I have to open the store." Defendant replied, "I will give you a dollar if you give me a ride home." Catalfamo said, "I can't because I just have to open the store. Leave me alone."

Defendant then said: "I will give you $20.00" and Catal-famo stated: "I don't care if you give me a million dollars. I am not going to take you. Leave me alone." Catalfamo then got out of his truck and started walking towards the door of his store. Defendant followed Catalfamo. Gloria Ramirez heard some noise and went outside to see what was taking place and noticed that defendant kept "hitting Philip. He kept hitting him around the head," "around the head," "on his side," and "Philip kept backing away," but was trying to defend himself. Defendant "kept going after him" and "hitting him and pushing" and saying "Why don't you fight me? I want you to fight me. You are not a man." Gloria called out for some one to help Catalfamo who was a man much older and smaller than defendant. A man came along and separated the two and Catalfamo then opened his store and Gloria returned to her residence. The defendant was dirty, had a bruise on his face, was not wearing a shirt and although he staggered somewhat there was nothing unusual in his speech.

Vernon Glover, a food sales supervisor, was on 103d Street at about 7:40 a.m. and saw defendant walking westerly on 103d Street about a block from the Catalfamo store. He did not have on a shirt, appeared to be bruised and was walking in an unsteady fashion when he, the defendant, approached two ladies who kept walking, "backing away from him—like he might be aggravating them." About 8 a.m. Glover again saw defendant and witnessed defendant fighting with Catalfamo in front of the latter's store. Glover jumped out of his truck and got between defendant and Catalfamo. Defendant "was shaking his finger" and saying, "You old man, I will get you." Catalfamo said, "Vernon, I don't know what is the matter with the man. I didn't do anything to him." Defendant stated that the night before he had been "in fights with some so and sos" and that he was the toughest man in Watts. Glover stated that Catalfamo appeared very flushed, "like he was excited or had a fever" and had an abrasion on his face. Glover stayed with Catalfamo for about 20 minutes until the latter called his wife.

Mrs. Catalfamo arrived at the store about 9 a.m. and saw the victim waiting on a customer even though he was bruised and was pale in coloring. She inquired of him as to his health and how he felt and he replied, "You know, I feel dizzy" and "I feel a hot flush coming through me." The son was called and arrived in about 20 minutes. Mr. Catalfamo who

was then sitting in the back of the store said, "I think I am going." A rescue squad was called as the son attempted artificial respiration. The officers administered oxygen but to no avail as Catalfamo died.

Officer Amador of the Los Angeles Police Department saw defendant staggering down 103d Street at about 8:10 a.m. and placed him under arrest for being drunk. At that time defendant was bruised about the face, had on no shirt and smelled of alcohol. Defendant was transferred to a hospital for treatment of his bruises and abrasions. The officer saw Catalfamo at the store and the latter refused any medical attention because "he had to open the shop—stay in the shop." Defendant told the officer: "I couldn't kill anybody. Sure, I was fighting, but I was jumped by about six Spics." Defendant made no complaint with reference to his having been robbed or beaten.

Dr. John Graham, a deputy medical examiner for the County of Los Angeles, performed an autopsy on Catalfamo at about 3 p.m. on June 10, 1967. He found abrasions over the face (one under and one over the left eye and one over the bridge of the nose). Also he found a hematoma under the capsule of the spleen (left side of the upper abdomen) and a contusion of the small bowel. These injuries were consistent with the victim's having been hit by fist blows with the fists of some person. The doctor as an expert stated in effect that under the circumstances of the physical condition of Catalfamo, and the altercation, that his heart was taxed beyond its limits and that a heart attack resulted. Further with reference as to whether there was a causal relationship between the blows struck upon the victim and his death the doctor said, "Oh, it is medically reasonably certain that it did. . . . I think we have to recognize that; however, when you consider the short interval between the alleged altercation and the time of death, I think you have to make a definite statement that it is definitely related."

The defendant testified that he got off from work about 1:20 a.m. June 10 and went to several bars and consumed drinks until 4 or 5 a.m., that he was attacked by some Negro fellows and was kicked, beaten and robbed of about $100. He stated that his next conscious recollection was when he was being questioned in the patrol car—that he had no recollection of any other events. A psychiatrist for defendant testified that defendant was dazed in the early morning hours and he was not "able to form a conscious intent, a rational conscious

intent.'' The doctor said that defendant was ''possibly mildly intoxicated, but by that I do not mean drunk.''

Appellant now asserts that death caused by a preexisting heart condition in the victim cannot be imputed to appellant unless the latter's actions specifically caused the death, that tort concepts of proximate cause are not applicable to criminal law, that a ''simple battery such as occurred in the instant case is not the type of unlawful act so as to bring into play the misdemeanor-manslaughter rule of Penal Code Section 192.2. [sic]'' Further that appellant's ''semi-conscious'' state of mind and his voluntary intoxication negated the necessary intent required for an assault and battery underlying the misdemeanor-manslaughter rule. Also that there was no evidence that appellant committed an assault and battery on the victim.

This case is clearly one where the appellant inflicted grievous, though perhaps not inherently fatal injuries upon the victim. True it is that the victim suffered from some preexisting deficient physical condition and perhaps the blows struck by appellant would not have killed a healthy man of younger years. It is beyond any reasonable doubt however and certain that the life of Catalfamo was destroyed as a result of the deliberate and wrongful acts of appellant in committing the unjustifiable assault and battery upon Catalfamo. [1] We are persuaded in any event that the consequences of an act or acts which are the efficient cause of death of another are not excused, nor is the criminal responsibility for causing death lessened, by the preexisting physical condition of the person killed at the time the act was done, or by his low vitality, which rendered him unable to withstand the shock of the blows inflicted, and without which predisposed condition the blows would not have been fatal, if a causal connection between the blows and the fact of death is made to appear. See 40 Am.Jur.2d, Homicide, sections 18, 20. Causation is well established in this case by the doctor's testimony. He said among other things in explaining the causal relationship of the blows to the victim and his death the following:

''During an altercation or during sustainment of such injuries the heart would be taxed, say, beyond its limits, and as a result of these injuries and taxing of the heart an increasing demand is placed on the heart, which it cannot handle, and a heart attack results.''

''Murder is never more than the shortening of life; if a defendant's culpable act has significantly decreased the

span of a human life, the law will not hear him say that his victim would thereafter have died in any event. [Citations.]" (*People* v. *Phillips*, 64 Cal.2d 574, 579 [51 Cal.Rptr. 225, 414 P.2d 353].)

The actions of appellant in this matter could not reasonably be described as a mere, simple battery. The actions come within the statutory language of Penal Code section 192, subdivision 2, as being "in the commission of an unlawful act, not amounting to a felony."

In this state it has been held repeatedly that "where a person, in committing an assault and battery without aggravating circumstances, unintentionally causes the death of his victim, the crime is manslaughter." (*People* v. *McManis*, 122 Cal.App.2d 891, 898 [266 P.2d 134]; *People* v. *Munn*, 65 Cal. 211, 213-214 [3 P. 650]; *People* v. *Miller*, 114 Cal.App. 293, 300 [299 P. 742]; *People* v. *Chutuk*, 18 Cal.App. 768, 770 [124 P. 566].)

Under the circumstances of this case neither the voluntary intoxication nor the claimed semi-consciousness of appellant are good defenses. There is no evidence in the record as to appellant's semi-consciousness except his statement to the defense psychiatrist and his testimony at the trial. Obviously the judge did not believe that appellant was in a semi-conscious state for he stated: "In this matter, first of all I think there is no question that there was a battery. I think the evidence only points to that conclusion.

"Secondly, I think that beyond any reasonable doubt that that battery led to the death of the decedent, and I don't think that there is a scintilla of evidence that the defendant was unconscious at the time these acts were committed, and I think that this is an unfortunate occurrence, and I am sure it was an occurrence that the result was certainly not one that was intended by the defendant; but, I feel that I have no alternative, and I do find the defendant guilty of involuntary manslaughter, a lesser and necessarily included offense of that charged in the Information."

Any unconsciousness, if there was such, caused by voluntary intoxication under the circumstances is not a good defense. (See *People* v. *Wilson*, 66 Cal.2d 749, 761 [59 Cal. Rptr. 156, 427 P.2d 820]; *People* v. *Mead*, 126 Cal.App.2d 164, 175 [271 P.2d 619].)

A killing constitutes "involuntary manslaughter" where death occurs, without malice or intent to kill, but in the commission of an unlawful act not amounting to a felony, and

hence in prosecution for such offense, intent of defendant is immaterial. (*People* v. *Barnett*, 77 Cal.App.2d 299, 304 [175 P.2d 237].)

The judgment is affirmed.

Lillie, J., and Thompson, J., concurred.