[No. S070959. July 10, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JULIUS LAMAR COX, Defendant and Appellant.

[No. B118572. July 10, 2000.]

In re JULIUS LAMAR COX on Habeas Corpus.

## Counsel

David B. Harrison, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar, Michael C. Keller, Susan D. Martynec and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BAXTER, J.**—We granted review in this case to determine whether conviction of involuntary manslaughter based on "an unlawful act, not amounting to felony" (Pen. Code, § 192, subd. (b)),[1] i.e., a killing resulting from the commission of a misdemeanor offense committed with general criminal intent, requires a further showing that the predicate misdemeanor was dangerous under the circumstances of its commission. The Court of Appeal below read our recent decision in *People v. Wells* (1996) 12 Cal.4th 979 [50 Cal.Rptr.2d 699, 911 P.2d 1374] (*Wells*) as impliedly holding that in cases not involving criminal negligence, conviction of involuntary manslaughter by "an unlawful act, not amounting to felony" (§ 192, subd. (b)) requires only that commission of the predicate misdemeanor offense with general criminal intent be shown. As will be explained, the Court of Appeal erred in approving the trial court's erroneous instruction on the nature of the elements of involuntary manslaughter. Accordingly, the judgment of the Court of Appeal shall be reversed and the matter remanded to afford that court an opportunity to determine whether the erroneous instruction was prejudicial on the evidence presented below.

### Facts and Procedural Background

Defendant was tried by a jury for involuntary manslaughter by an unlawful act not amounting to felony, to wit, misdemeanor battery. (§§ 192, subd.

---

[1]All further statutory references are to this code unless otherwise indicated.

(b), 242.) During the early morning hours of August 22, 1996, after drinking alcohol and smoking crack cocaine, Evelonia Hunter and the deceased, Duane Spann, ran into defendant and Steve Vickers in front of the motel where Hunter was renting a room in Pomona. Hunter and Vickers, her former boyfriend, began arguing. Vickers spit in Hunter's face and slapped Spann with his open left hand. About a minute later defendant punched Spann with a "solid blow" on the right side of his head, using his fist. Spann had not hit defendant or Vickers. Spann fell to the pavement and appeared to have been knocked unconscious. Defendant and Vickers left the scene.

Hunter tried to arouse Spann by touching his face and calling his name.[2] After two or three minutes, Spann regained consciousness and Hunter managed to assist him to his feet. He was still off-balance and unable to walk by himself. Hunter helped Spann move about 20 feet to a brick ledge where he sat for two to three minutes. Hunter then helped Spann walk the remaining 35 feet to her motel room.

Once inside the room, Hunter and Spann sat on the bed and talked for a while. Spann was unable to speak clearly; his speech, which had previously been normal, was slow and slurred. Spann was still off-balance but able to help Hunter prepare the bed for sleep. Hunter asked Spann if he was all right or if he wanted to call 911. Spann replied that he did not want to call 911. Spann and Hunter went to sleep between 3:00 and 4:00 a.m.

Hunter awoke at approximately 6:00 or 6:30 a.m. Spann was still sleeping. Hunter was unable to awaken him from his sleep, although he did cough and move his hands. She summoned the assistance of a man outside the motel and together they carried Spann outside, propped him against a wall, tried to awaken or revive him with some water, then called the police. Firemen and paramedics arrived and transported Spann by ambulance to the hospital, where he died at approximately 8:30 p.m. that same evening.

Jimmie Manning testified for the prosecution. Manning and defendant were sitting against a fence across the street from the motel on the morning in question and observed Hunter and a man carry out the victim. Defendant told Manning to "go and put some water on him" because "that was the fool that I knocked out last night."

Dr. Ogbonna Chinwah, a forensic pathologist and deputy medical examiner with the Department of Coroner of Los Angeles County, performed an autopsy on Spann. Dr. Chinwah was unable to observe any external head

---

[2]Hunter testified on redirect examination that a man on the street, possibly named Shotlow, assisted her and may have removed money from Spann's wallet while he was down.

injuries due to incisions that had been made in Spann's scalp as part of the craniotomy performed in the hospital to relieve pressure on his brain in an effort to save his life. The autopsy revealed an extensive skull fracture and internal head injuries that resulted in hemorrhaging of the blood vessels between the skull and the brain (subdural hematoma) and eventual death. Although Dr. Chinwah opined that blunt force trauma had caused the skull fracture and fatal head injuries, his testimony was equivocal as to whether a blow to Spann's head with a fist was the likely cause of such injuries, particularly given Hunter's account of Spann's limited ability to walk and talk for some time after the assault. The results of Spann's toxicology report indicated positive signs of alcohol, morphine, and cocaine in his blood, but Dr. Chinwah concluded the level of drugs in Spann's system was not lethal and did not cause his death.

Defendant did not testify in his own behalf. At the close of the People's case-in-chief, defense counsel moved for a directed verdict for insufficient evidence (§ 1118.1) based on Dr. Chinwah's testimony that it was not likely the fatal head injuries suffered by the victim had been caused by a blow from a fist, or that the victim could have walked and talked in the manner testified to by Hunter after having suffering such extensive injuries. The motion was denied, the trial court indicating that although it was "a circumstantial evidence case," the coroner's testimony would support a finding that defendant's blow with his fist to Spann's head had caused the injuries that eventually led to death, and that defense counsel's speculation notwithstanding, there was no other evidence that either Hunter or anyone else had caused the victim's death. In closing argument to the jury, defense counsel conceded that defendant had punched the victim but sought to cast doubt on the credibility of Hunter's testimony and emphasize the coroner's testimony that a punch with a fist was a possible but not likely cause of the fatal injuries.

The jury was instructed that, as a matter of law, battery is an inherently dangerous offense and therefore a predicate for involuntary manslaughter without any further proof regarding the circumstances surrounding commission of that underlying misdemeanor. Defendant was convicted of involuntary manslaughter as charged.

On appeal, relying on *Wells, supra,* 12 Cal.4th 979, defendant contended the trial court committed per se reversible error in instructing the jury on the elements of involuntary manslaughter. Specifically, he contended the jury should have been instructed that the unlawful act or misdemeanor battery that resulted in Spann's death had to be found dangerous under the circumstances of its commission in order to support a conviction of involuntary

manslaughter. Defendant further contended his trial counsel's failure to object to the instruction given constituted ineffective assistance of counsel.

The Court of Appeal found no reversible error and no ineffective assistance of counsel, and affirmed. Although recognizing that the involuntary manslaughter instruction given below was wrong insofar as it characterized battery as an inherently dangerous offense (*Wells, supra,* 12 Cal.4th at p. 988 [neither assault nor battery is an inherently dangerous misdemeanor]), the Court of Appeal went on to conclude that "[b]ecause the offense of battery necessarily involves criminal intent, no additional finding of criminal negligence is necessary." The court reasoned, "[W]e do not believe that the 'dangerousness' of the unlawful act is an element of the crime of involuntary manslaughter when the unlawful act is committed with criminal intent. Rather, we believe that the element of 'dangerousness' applies only to those unlawful acts which do not require a criminal intent, but which, because conducted in a dangerous, criminally negligent manner, encompass criminal culpability."

We granted review to determine whether our holding in *Wells, supra,* 12 Cal.4th 979, requiring that the underlying unlawful act on which a charge of involuntary manslaughter is based must be shown to be dangerous under the circumstances of its commission, applies equally to all misdemeanors committed with general criminal intent on which a charge of involuntary manslaughter is predicated.

## Discussion

### Instruction on Involuntary Manslaughter

In *Wells, supra,* 12 Cal.4th 979, this court resolved the issue of whether an unlawful act on which a charge of involuntary manslaughter is predicated must be inherently dangerous, that is, dangerous in the abstract, or dangerous under the circumstances of its commission. We held that "the offense must be dangerous under the circumstances of its commission. The inherent or abstract nature of a misdemeanor which underlies an involuntary manslaughter charge is not dispositive." (*Id.* at p. 988.)

*Wells* involved a prosecution for vehicular manslaughter under section 192, subdivision (c)(1). The evidence established that the defendant had been speeding on a curving, hilly road when his out-of-control car struck another vehicle, injuring the driver and killing a passenger. (*Wells, supra,* 12 Cal.4th at pp. 982-983.) Section 192, subdivision (c)(1) defines one of the three kinds of vehicular manslaughter described in section 192 as "driving a

vehicle in the commission of an unlawful act, not amounting to felony, and with gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." In *Wells* we were asked to decide "if the 'unlawful act' to which the statute refers must be an offense that is inherently dangerous to human life or safety, and if so, whether exceeding the maximum speed limit [constitutes] such an unlawful act." (*Wells, supra,* 12 Cal.4th at p. 981.)

Although the precise issue in *Wells* was one of statutory construction of section 192, subdivision (c)(1) (defining vehicular manslaughter), we agreed with the Court of Appeal in that case that "the use of the term 'in the commission of an unlawful act, not amounting to felony' in both section 192(b) and section 192(c)(1) reflects legislative intent that the same meaning be accorded the term in each subdivision." (*Wells, supra,* 12 Cal.4th at p. 985.) Accordingly, our analysis and holding in *Wells* informs our construction of the term "unlawful act, not amounting to felony" found in section 192, subdivision (b) (section 192(b)) and directly at issue in this case.

We explained in *Wells* that the Court of Appeal in that case, as well as several previously reported appellate decisions (e.g., *People v. Wright* (1976) 60 Cal.App.3d 6 [131 Cal.Rptr. 311]; *People v. Ramsey* (1971) 17 Cal.App.3d 731 [95 Cal.Rptr. 231]), had misinterpreted this court's earlier decision in *People v. Stuart* (1956) 47 Cal.2d 167 [302 P.2d 5, 55 A.L.R.2d 705] (*Stuart*) as requiring that the predicate misdemeanor offense underlying a conviction of involuntary manslaughter be "inherently dangerous in the abstract." (*Wells, supra,* 12 Cal.4th at p. 984.) The term "unlawful act, not amounting to felony" as used in section 192(b) codifies the traditional common law form of involuntary manslaughter as the predicate for finding that a homicide committed without malice was involuntary manslaughter. (*Wells, supra,* 12 Cal.4th at p. 983.) "When that phrase was construed in *Stuart,* this court had stated that to support an involuntary manslaughter conviction under section 192(b) the 'unlawful act' must be dangerous to human life and safety and committed with criminal intent or criminal negligence pursuant to section 20. (*Stuart, supra,* 47 Cal.2d at p. 173.) Although *Stuart* had said only that the unlawful act must be dangerous to human life and safety, the Court of Appeal [in *Wells*] understood the holding of *Stuart* to be that the underlying misdemeanor offense must be one that is inherently dangerous in the abstract." (*Wells, supra,* 12 Cal.4th at pp. 983-984.)

Section 20 provides that "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." In *Stuart, supra,* 47 Cal.2d 167, a pharmacist violated a Health and Safety Code

provision by unwittingly preparing and selling an adulterated and mis-branded drug. He was convicted of the crime of involuntary manslaughter. This court reversed his conviction, concluding the requirements of section 20 had not been met.

The defendant in *Stuart* had filled a prescription for sodium citrate from a bottle so labeled which actually contained some sodium nitrite. The defend-ant was unaware that the bottle was mislabeled, and the two substances, virtually identical in appearance, could not be distinguished absent a chemi-cal analysis. The patient died from the effects of sodium nitrite after ingesting the prescribed medication. However, there was no evidence "that would justify an inference that [the] defendant knew or should have known that the bottle labeled sodium citrate contained sodium nitrite." (*Stuart, supra,* 47 Cal.2d at p. 171.)

We concluded in *Stuart* that the "act" underlying the offense of involun-tary manslaughter "must be committed with criminal intent or criminal negligence to be an unlawful act within the meaning of section 192." (*Stuart, supra,* 47 Cal.2d at p. 173.) Although the pharmacist's conduct in *Stuart* constituted a malum prohibitum or strict liability violation of the applicable Health and Safety Code provision, because he neither intentionally nor through criminal negligence prepared or sold an adulterated or misbranded drug, a requisite to criminal liability was absent and the manslaughter conviction could not stand. We summarized our analysis and holding in *Stuart* as follows: "To be an unlawful act within the meaning of section 192, therefore, the act in question must be dangerous to human life or safety and meet the conditions of section 20." (*Stuart, supra,* 47 Cal.2d at p. 173.)

Although *Stuart* required only that criminal negligence or an act that is "dangerous to human life or safety" be shown in order to convict of misdemeanor manslaughter under section 192(b) (*Stuart, supra,* 47 Cal.2d at p. 173), subsequent to *Stuart,* some courts interpreted our holding in that case as requiring that the unlawful act or misdemeanor offense on which a charge of involuntary manslaughter is predicated be inherently dangerous in the abstract. (See, e.g., *People v. Wright, supra,* 60 Cal.App.3d 6; *People v. Ramsey, supra,* 17 Cal.App.3d 731.) Several decisions further required that the trial court instruct sua sponte on the concept. (See, e.g., *People v. McManis* (1972) 26 Cal.App.3d 608 [102 Cal.Rptr. 889] (*McManis*).)[3]

We therefore set out in *Wells, supra,* 12 Cal.4th 979, to resolve the confusion, and in that case explained: "In stating that 'the act in question

---

[3]"An instruction defining misdemeanor within the context of a misdemeanor-manslaughter instruction must be given *sua sponte.* (*People* v. *Failla* [(1966)] 64 Cal.2d 560, 564 [51 Cal.Rptr. 103, 414 P.2d 39] [citations].) Failure to do so may allow the trier of fact to engage

must be dangerous to human life or safety and meet the conditions of section 20' (*Stuart, supra,* 47 Cal.2d at p. 173), we did not in *Stuart* require that 'the unlawful act, not amounting to felony,' constitute an 'inherently dangerous act,' or be malum in se [i.e., commonly requiring general or specific intent]. Instead, we required that commission of the unlawful act involve criminal culpability, i.e., have been done in a dangerous manner." (*Wells, supra,* 12 Cal.4th at p. 987.) "Thus, *Stuart* does not require an act 'inherently dangerous in the abstract' for any form of manslaughter. It merely requires that the unlawful act causing death be committed 'through criminal negligence.' (*Stuart, supra,* 47 Cal.2d 167, 174.)" (*Wells, supra,* 12 Cal.4th at p. 988.) "We are satisfied therefore that the offense must be dangerous under the circumstances of its commission. The inherent or abstract nature of a misdemeanor which underlies an involuntary manslaughter charge is not dispositive." (*Ibid.*)

The Court of Appeal in this case read our holding in *Wells* to be limited to those charges of involuntary manslaughter based on unlawful acts that do not require a criminal intent, but which, because they are conducted in a dangerous, criminally negligent manner, encompass criminal culpability. The court concluded that when a charge of involuntary manslaughter is based instead on the commission of "an unlawful act, not amounting to felony" (§ 192(b)), that is to say, a misdemeanor offense committed with general criminal intent, as opposed to conduct amounting to criminal negligence, the "dangerousness" of the misdemeanor is irrelevant. Consequently, the court held that the elements of the offense of involuntary manslaughter in this case were simply that the defendant committed a misdemeanor battery that caused the victim's death.

The Court of Appeal misread *Wells*. First, it is clear from our express holding in *Wells* that the rationale of our decision was addressed to both

in unguided speculation as to what conduct is sufficient to constitute a misdemeanor inherently dangerous to human life." (*McManis, supra,* 26 Cal.App.3d at p. 614.)

Interestingly, this court's decision in *People v. Failla, supra,* 64 Cal.2d 560 (*Failla*), upon which the *McManis* court relied with little substantive analysis, had nothing to do with homicide or manslaughter. *Failla* involved a prosecution for multiple counts of residential burglary in which we held, in regard to proof of the defendant's unlawful intent, that "where the evidence permits an inference that the defendant at the time of entry intended to commit one or more felonies and also an inference that his intent was merely to commit one or more misdemeanors or acts not punishable as crimes, the court must define 'felony' and must instruct the jury which acts, among those which the jury could infer the defendant intended to commit, amount to felonies." (*Failla, supra,* 64 Cal.2d at p. 564.) Indeed the *McManis* court's reliance on *Failla* is questionable in that the court was concerned with whether a jury would "engage in unguided speculation" (*McManis, supra,* 26 Cal.App.3d at p. 614) as to the inherently dangerous nature of the predicate misdemeanors, and not with the actual danger under the attending circumstances of their commission.

bases for establishing involuntary manslaughter under section 192(b):[4] "We are satisfied therefore that *the offense* must be dangerous under the circumstances of its commission. The inherent or abstract nature of *a misdemeanor which underlies an involuntary manslaughter charge* is not dispositive." (*Wells, supra,* 12 Cal.4th at p. 988, italics added.) Had we intended our holding in *Wells* to be limited only to prosecutions for involuntary manslaughter based on unlawful acts not requiring general criminal intent that are nonetheless conducted in a dangerous, criminally negligent manner, we would not have used the terms "offense" and "misdemeanor" throughout our opinion and holdings.

Second, the Court of Appeal missed the mark when it reasoned: "That the *Wells* court did not intend to impose a 'dangerous in the commission' requirement on unlawful acts which are committed with criminal intent is evident from the court's acknowledgment that, while assault and battery are not inherently dangerous misdemeanors, they '*may* be predicates for a conviction of involuntary manslaughter under section 192(b).' (*Wells, supra,* 12 Cal.4th at p. 988.) This is so because the criminal culpability for involuntary manslaughter which is required by section 20 is established by the finding that the defendant committed a battery. Because the offense of battery necessarily involves criminal intent, no additional finding of criminal negligence is necessary." (Italics added.)

To say that because proof of battery requires general criminal intent it is unnecessary to further show that the commission of the battery was dangerous under the circumstances leading to the victim's death merely begs the question at hand. That misdemeanor assault and battery *may* be predicates for conviction of involuntary manslaughter logically implies they also may not. *Wells* recognizes that the crimes of misdemeanor assault and battery are not inherently dangerous in the abstract (i.e., the slightest touching may constitute a battery, and even the utterance of words, when coupled with possession of a weapon, may constitute an assault). *Wells* explains that misdemeanor assault and battery *may* support a conviction of involuntary manslaughter under section 192(b) if shown to be dangerous under the circumstances of their commission. Had we intended to suggest in *Wells* that every killing occurring in the commission of misdemeanor assault or battery is involuntary manslaughter without any further consideration of the factual circumstances surrounding commission of those offenses, we would not have

---

[4] Once again, although *Wells* involved a prosecution for vehicular manslaughter under section 192, subdivision (c), we explained why the Legislature's utilization of the same term "unlawful act, not amounting to felony" in both subdivisions (b) and (c) of section 192 rendered our analysis and holding applicable to all forms of involuntary manslaughter, including vehicular manslaughter (§ 192, subd. (c)) and misdemeanor manslaughter (§ 192(b)). (*Wells, supra,* 12 Cal.4th at pp. 985, 986.)

said commission of assault or battery *may* support a conviction of involuntary manslaughter; instead, we would have stated a killing in the commission of either of those offenses *is* involuntary manslaughter, regardless of the facts. The Court of Appeal mistakenly read *Wells* in this manner. Under the Court of Appeal's rationale, a killing in the commission of every misdemeanor assault or battery, and indeed every misdemeanor or infraction[5] requiring general criminal intent, would automatically constitute involuntary manslaughter. That was not the intended holding of *Wells*.

Third, as pointed out in *Wells,* over 40 years ago this court observed in *Stuart* that " '[w]ords such as "unlawful act, not amounting to felony" have been included in most definitions of manslaughter since the time of Blackstone [citations] and even since the time of Lord Hale, "unlawful act" as it pertains to manslaughter has been interpreted as meaning an act that *aside from its unlawfulness was of such a dangerous nature as to justify a conviction of manslaughter if done intentionally or without due caution.* [Citations.] To be an unlawful act within the meaning of section 192, therefore, the act in question must be dangerous to human life or safety *and* meet the conditions of section 20 [i.e., be committed with criminal intent].' (*Stuart, supra,* 47 Cal.2d 167, 173.)" (*Wells, supra,* 12 Cal.4th at p. 986, fn. omitted, italics added.)

*Wells* (and *Stuart*) plainly hold that where involuntary manslaughter is predicated on an unlawful act constituting a misdemeanor, it must still be shown that such misdemeanor was dangerous to human life or safety under the circumstances of its commission. We recognize, as did the Court of Appeal below, that a line of early California intermediate appellate court decisions, many predating *Stuart,* held that "where a person, in committing an assault and battery . . . unintentionally causes the death of his victim, the crime is [involuntary] manslaughter. [Citations.]" (*People v. McManis* (1954) 122 Cal.App.2d 891, 898 [266 P.2d 134]; see also *People v. Morgan* (1969) 275 Cal.App.2d 603, 608 [79 Cal.Rptr. 911]; *People v. Tophia* (1959) 167 Cal.App.2d 39, 47-48 [334 P.2d 133]; *People v. Le Grant* (1946) 76 Cal.App.2d 148, 152 [172 P.2d 554]; *People v. Miller* (1931) 114 Cal.App. 293, 301 [299 P. 742].) To the extent these cases may be read as establishing in California a misdemeanor-manslaughter rule that automatically establishes the offense of involuntary manslaughter whenever a killing results from the commission of any misdemeanor, including assault or battery, they do not survive our holding in *Stuart, supra,* 47 Cal.2d 167, as clarified in *Wells, supra,* 12 Cal.4th 979.

As LaFave and Scott point out, early cases relying on the so-called malum in se/malum prohibitum distinction in fashioning an automatic misdemeanor-manslaughter rule for cases in which the predicate unlawful act

---

[5]We further held in *Wells* that "an unlawful act, not amounting to felony" (§ 192(b)) may be either a misdemeanor or an infraction. (*Wells, supra,* 12 Cal.4th at p. 982, fn. 2.)

resulting in a killing was malum in se (i.e., a misdemeanor committed with general criminal intent) were indeed widespread. (2 LaFave & Scott, Substantive Criminal Law (1986) Crimes Against the Person, § 7.13(d), p. 296 (LaFave & Scott); see, e.g., *Broxton v. State* (1936) 27 Ala.App. 298 [171 So. 390]; *State v. Boag* (1936) 154 Or. 354 [59 P.2d 396]; *State v. Horton* (1905) 139 N.C. 588 [51 S.E. 945].) But the distinction has long since been roundly criticized as without support in the common law (see *State v. Puryear* (1979) 121 Ariz. 359 [590 P.2d 475, 479], citing Wilner, *Unintentional Homicide in the Commission of an Unlawful Act* (1939) 87 U. Pa. L.Rev. 811, 827), and even those courts that relied on the distinction in the past have abandoned it, describing it as one of "dubious origins and doubtful validity." (*State v. Puryear, supra,* 590 P.2d at p. 480; 2 LaFave & Scott, *supra,* § 7.13(d), p. 297; see also Perkins & Boyce, Criminal Law (3d ed. 1982) Offenses Against the Person, p. 114 [calling for abolition of misdemeanor-manslaughter rule triggered by commission of any misdemeanor with general criminal intent].)

As has been shown, over 40 years ago, this court rejected a misdemeanor-manslaughter rule that elevates any killing resulting from the commission of a misdemeanor to involuntary manslaughter, when we construed the "unlawful act, not amounting to felony" language of section 192(b) as requiring a showing that the predicate unlawful act or misdemeanor offense is dangerous to human life or safety. (*Stuart, supra,* 47 Cal.2d at p. 173.) *Wells* reaffirmed this principle, clarifying that the test is not whether the predicate misdemeanor is inherently dangerous in the abstract, but whether it is dangerous under the circumstances of its commission. (*Wells, supra,* 12 Cal.4th at p. 988.)

*Prejudice*

█ The involuntary manslaughter instruction given below was incorrect under *Wells* insofar as it informed the jury that misdemeanor battery is an inherently dangerous offense in the abstract. The instruction further removed from the jury's determination the question of the dangerousness of the predicate misdemeanor battery under the circumstances of its commission, thus permitting the jury to find defendant guilty of involuntary manslaughter on a finding that he committed the battery with general criminal intent. "Under established law, instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479-480 [76 Cal.Rptr.2d 180, 957 P.2d 869] (*Flood*).) We concluded in *Flood* that such misinstruction was subject to harmless error analysis under the *Chapman* standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87

S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].) Last term, in *Neder v. United States* (1999) 527 U.S. 1 [119 S.Ct. 1827, 144 L.Ed.2d 35] (*Neder*), the high court confirmed our analysis and holding in *Flood*.[6]

Because the Court of Appeal erroneously concluded that the involuntary manslaughter instruction given below did not have to comply with *Wells*, it did not have occasion to pass on the question whether such erroneous instruction prejudiced the verdict. In light of the clarification provided herein, we believe it appropriate to remand the matter to the Court of Appeal to afford that court an opportunity in the first instance to entertain and resolve the question of prejudice. (See *People v. Breverman* (1998) 19 Cal.4th 142, 178-179 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)[7] If the Court of Appeal concludes by correct standards that the error was harmless, it can

---

[6]*Neder* is the high court's most recent pronouncement on the harmless error standard of review applicable to federal constitutional error arising from misinstruction on the elements of an offense. The high court explained in *Neder* that, "[u]nlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (*Neder, supra,* 527 U.S. at p. 9 [119 S.Ct. at p. 1833], italics omitted; see also *Johnson v. United States* (1997) 520 U.S. 461, 470 [117 S.Ct. 1544, 1550, 137 L.Ed.2d 718, 157 A.L.R. Fed. 789].) The high court further observed that "the absence of a 'complete verdict' on every element of the offense establishes no more than that an improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee. The issue here, however, is not whether a jury instruction that omits an element of the offense was error [a point that was uncontested in *Neder*, as is the case here] but whether the error is subject to harmless-error analysis. We think our decisions in *Pope* [*v. Illinois* (1987) 481 U.S. 497 [107 S.Ct. 1918, 95 L.Ed.2d 439] (misstatement of element found harmless)], *Carella* [*v. California* (1989) 491 U.S. 263 [109 S.Ct. 2419, 105 L.Ed.2d 218] (mandatory conclusive presumption found harmless)], and [*California v. Roy* (1996) 519 U.S. 2 [117 S.Ct. 337, 136 L.Ed.2d 266] (omission of element of crime found harmless)] dictate [an affirmative] answer to that question." (*Neder, supra,* 527 U.S. at pp. 12-13 [119 S.Ct. at p. 1835].) Lastly, having concluded such instructional error is subject to harmless error analysis, the high court removed any remaining doubt about the applicable standard of review of such error, which is the *Chapman* test: "The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination, see *Arizona v. Fulminante,* 499 U.S. 279 [111 S.Ct. 1246, 113 L.Ed.2d 302] (1991), and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment, see *Delaware v. Van Arsdall* [(1986) 475 U.S. 673 [106 S.Ct. 1431, 89 L.Ed.2d 674]], are both subject to harmless-error analysis under our cases. Such errors, no less than the failure to instruct on an element in violation of the right to a jury trial, infringe upon the jury's factfinding role and affect the jury's deliberative process in ways that are, strictly speaking, not readily calculable. We think, therefore, that the harmless-error inquiry must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" (*Neder, supra,* 527 U.S. at p. 18 [119 S.Ct. at p. 1838].)

[7]In *People v. Breverman, supra,* 19 Cal.4th 142, we concluded the failure to instruct sua sponte on a lesser included offense in a noncapital case is an error of California law and accordingly subject only to state standards of reversibility. (*Id.* at p. 178.) Because the Court of Appeal in *Breverman* did not attempt to evaluate the erroneous omission of instructions on heat of passion by examining the entire record evidence to determine whether it was reasonably probable the error affected the outcome (having instead followed prior California

then address any additional issues properly preserved and raised by defendant on appeal or habeas corpus. (*Breverman, supra,* at p. 179; *People v. Cahill* (1993) 5 Cal.4th 478, 510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

### Conclusion

The judgment of the Court of Appeal is reversed, and the matter remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied August 9, 2000, and the opinion was modified to read as printed above.

---

decisions requiring reversal under a different standard of review), "we deem[ed] it appropriate to remand the matter to the Court of Appeal to permit that court to determine prejudice under the principles established herein." (*Id.* at p. 179.) Although in this case we clarify, rather than overrule, a prior decision (*Wells*) that the Court of Appeal mistakenly read as validating the erroneous involuntary manslaughter instruction given below, since the Court of Appeal, like the Court of Appeal in *Breverman,* never reached the question of prejudice, we conclude a similar disposition is appropriately followed here.