Filed 3/7/14  P. v. Larson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA JAMES LARSON,<br><br>    Defendant and Appellant. | D063069<br><br><br><br>(Super. Ct. Nos. SCD 235068,<br>                    SCD 219125) |

APPEAL from a judgment of the Superior Court of San Diego County, Theodore M. Weathers, Judge.  Affirmed.

Michael Bacall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Assistant Attorneys General, Charles C. Ragland, Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joshua James Larson of second degree murder (Pen. Code,[1] § 187, subd. (a)); assault with a deadly weapon by means of force likely to cause great bodily injury (§ 245, subd. (a)(1)); and threatening a witness (§ 140). The jury found true allegations that in committing the murder and assault, Larson personally used a deadly weapon. (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23).) The court sentenced Larson to a total term of 19 years to life in state prison.

Larson contends the court: (1) violated his constitutional right to present a defense by precluding him from introducing certain third party culpability evidence; and (2) prejudicially erred by denying his request to instruct the jury regarding involuntary manslaughter. We affirm the judgment.

## FACTUAL BACKGROUND

On June 22, 2011, Nathan Meza and his boyfriend Jason Huggins, also known as Cowboy, were living in a tent in a San Diego canyon. They spent that day together visiting different places for meals, medications and clothes. That afternoon, as they were going to a fast food restaurant, they encountered Larson and another man. Meza testified that Huggins exchanged words with one of the men. Huggins and Meza continued to the restaurant. Minutes later, Larson followed them inside the restaurant. Huggins and Meza ordered their food and left with it to return to their tent.

After a few minutes, Larson appeared at their tent. Huggins said, "Oh no," in a worried tone of voice. Larson, referring to Huggins, told Meza something like: "You

---

[1] All statutory references are to the Penal Code unless otherwise stated.

know this little shit right here you're with?  He accused me in court."  Larson asked, "Have you ever felt what a rock in the face feels like?"  At that, Larson threw a large rock inside the tent, hitting Meza's face and knee.  Larson walked around the tent, flicking a cigarette lighter and threatening to burn them.  Larson threw his body against the tent, and Meza and Huggins struggled to prevent the tent from collapsing.  Meza left the tent and saw Larson holding Huggins in a chokehold as they fought.  Meza asked what was happening, and told Larson not to kill Huggins.  Larson said something like, "I'm not going to hurt him.  I just want to scare him."  Larson warned Meza to get away from the scene.

Meza left the canyon, not thinking the fight would cause Huggins grave injuries or his death.  Meza went to a hospital and received stitches for his injuries.  That night, Meza initially lied to police, telling them the fight had occurred behind a grocery store near the canyon.  Meza later explained he had lied because he was afraid to further anger one of the older residents of the canyon who he had previously angered by bringing a stranger to the canyon.

Judy Bryant, who also lived in the canyon, testified that Larson went to the canyon that evening asking for Huggins's tent, and she directed Larson to it.  Bryant then went to the store, and upon leaving, she saw Huggins waving his arms and asking for help. Huggins seemed like he was going to pass out, and he said a man had hit him with a rock.

Shortly after 6:00 p.m. that day, a fire captain, a paramedic, and an emergency medical technician attended to Huggins near the grocery store.  Huggins was agitated and uncooperative, screaming that he was hit by a rock and his head hurt.  Huggins also

3

repeatedly asked for Meza. Huggins said he knew who had hit him with the rock, but did not disclose his attacker's name. Huggins had no outward bleeding on his head or signs of trauma. He was taken to the hospital.

Medical personnel discovered Huggins had a fracture to the head and a hematoma or bleeding inside the skull. He was operated on to relieve the pressure from the hemorrhage, but never recovered. Huggins died on July 6, 2011, after he had been in a coma for approximately two weeks. A pathologist testified that Huggins had bruises on his body that were consistent with him being punched. His cause of death was head injury, and the manner of death was homicide.

Surveillance images taken at the restaurant showed Huggins and Meza had arrived there at approximately 4:41 p.m., followed shortly thereafter by Larson. Other surveillance images taken from cameras mounted on a condominium building recorded Huggins and Meza walking toward the canyon, and Larson following shortly afterwards. The condominium cameras also captured Huggins leaving the Canyon after the attack.

A criminal investigator analyzed Larson's cell phone call records for June 22, 2011, and concluded calls were made to and from that phone while it was in the vicinity of the restaurant and the canyon around the relevant times.

Police arrested Larson and retrieved from his house items of clothing matching those he was seen wearing on the day of the crime. Upon Larson's arrest, a detective told him he was a suspect in a very serious crime that had caused moderate injuries to one victim and severe injuries to another victim. Approximately an hour and a half later, Larson asked the detective for the names of the victims, and which one was severely

4

injured. The detective identified Huggins as being severely injured. Larson bowed his head and did not respond.

The parties stipulated that in February 2009, Huggins had reported to police that Larson had robbed him of his wallet. Larson was arrested and charged with grand theft from a person. In March 2009, Huggins testified against Larson at trial on that matter. Larson pleaded guilty to the crime and spent 88 days in jail. In February 2011, Larson served jail time for violating probation by testing positive for drugs. He was released from custody on May 4, 2011.

The jury heard audio recordings of Larson's jailhouse phone calls to his parents shortly after his arrest. In one call, Larson described Huggins as having "showed up at court, pointed the finger at me, and said, 'This is the guy who sold me drugs and, uh, uh, stole my wallet and whatever." Larson's mother responded, "Mm-hmm. So obviously what you told me earlier about letting all that go really wasn't true." Larson replied, "Then it was let go." Larson also admitted in a phone call that he had seen Huggins at the fast food restaurant. Larson continued: "[I]t didn't seem like he recognized me or anything, and so I was going to leave him alone. And I don't know if I can say anything more than that right now." Larson recounted to his mother that somebody had asked him, "Why'd you do it?" Larson's reaction to that question was, ". . . like I killed this guy on purpose or something. You know? What difference is it gonna make? My life is over."

At trial, Chandice Lucas denied killing Huggins or having previously confessed to doing so. Lucas also denied having had a sexual or dating relationship with Huggins. Rather, Lucas testified that he and Huggins were friends, and in some ways had a father-

5

son type relationship. Lucas testified that on the day before the crime, he had told Huggins that in order for Huggins to get off the streets and join Lucas in a business venture, Huggins would have to get rid of Meza. Although Lucas acknowledged telling an investigator that that conversation with Huggins had occurred on June 22, 2011, he clarified that the conversation with Huggins had happened one day earlier. Lucas admitted that one day when Huggins was in a coma, he met Meza at the hospital, pushed Meza against a wall, insisted he go to a drug rehabilitation center, and threatened to "beat his butt because he left [Huggins in the canyon] to die."

After the close of evidence and just before closing arguments, a juror asked the court about Lucas's whereabouts on June 22, 2011, between 5:00 p.m. and 6:30 p.m. The court discussed the issue with counsel and stated that Lucas had been excused as a witness and it was too late to address the juror's question.

DISCUSSION

I.

Larson argues the trial court should have permitted him to present additional third party evidence that Lucas was the purported killer, contending: "The trial court erroneously precluded the defense from introducing evidence that [Lucas] and [Huggins] were selling HIV medicine for cash and/or methamphetamine and that [Lucas] was angry with [Huggins] because [Huggins] gave [Lucas] no money to pay the supplier. The evidence was more probative than prejudicial under Evidence Code section 352." (Italics omitted.)

6

A.  *Background*

The People moved in limine to exclude the proffered third party culpability evidence on grounds it was speculative.  At a hearing held under Evidence Code section 402, the prosecutor argued:  "This evidence is incompetent hearsay and is inadmissible.  Further, the defense has proffered no evidence of any person with a particular motive to kill Huggins as it relates to his alleged HIV medication business.  There is no direct or circumstantial evidence linking any person to the alleged HIV medication business and the death of Huggins."

Defense counsel countered that there was testimony supporting the assertion that Lucas and Huggins were involved in the sale of HIV medications.  Defense counsel also noted that one witness had testified that Lucas had angrily argued with Huggins over monies Huggins allegedly owed Lucas.

The prosecutor rebutted defense counsel's theories regarding third party culpability, pointing out that there was no cell phone evidence placing Lucas near the canyon between 3:00 p.m. and 6:00 p.m. on the day of the crime.  The prosecutor argued: "The fact that there was money owed over drugs—even if that were true, and there was some anger, I still think that that's a huge leap, to say that that provides a motive for the killing in this case."

The court partially ruled in Larson's favor, permitting him to question Lucas whether Huggins had owed him money.  However, the court excluded testimony regarding Huggins's alleged sale of HIV medication, ruling, "I think that is not particularly probative.  I think it's highly prejudicial.  I think it would result in a mini-trial

7

within this trial. I think it would result in undue consumption of time, and I don't think it's particularly probative. [¶] This notion that Mr. Huggins owed unnamed people in Los Angeles, I think is so far removed and speculative as to not fall within the [standard set forth in *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*) regarding] admissibility. Similarly, the testimony . . . about these individuals involved in sales of drugs and then leading to HIV medication, I think is, once again, not particularly probative."

B. *Applicable Law*

In *Hall*, *supra*, 41 Cal.3d 826, the California Supreme Court explained the criteria for admitting third party culpability evidence: "To be admissible, the third-party [culpability] evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime. [¶] . . . [¶] . . . [C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible [citation] unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion [under Evidence Code section 352]." (*Hall*, at pp. 833-834.) The trial court's discretionary ruling under Evidence Code section 352 may not be disturbed absent a showing that the court abused its discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 372-373.)

8

C. *Analysis*

The court did not abuse its discretion in excluding testimony regarding Lucas and Huggins's involvement in the sale of HIV medication. Under *Hall*, *supra*, 41 Cal.3d 826, the proffered testimony did not provide direct or circumstantial evidence linking Lucas to the actual perpetration of the murder. Rather, at best, it would point to motive or opportunity, but that does not suffice to admit such third party culpability evidence. The court reasonably concluded the challenged testimony would consume too much time and lead to a trial within a trial. Further, we note that the topic of the sale of HIV medication in exchange for methamphetamine is a highly prejudicial one, and it had no probative value in this case.

Even assuming error, the court did not act arbitrarily when it compromised by permitting the defense to ask Lucas about the relevant issue of whether Huggins had owed him money. "Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under [*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)

In applying the *Watson*, *supra*, 46 Cal.2d 818 standard of prejudice, we follow the California Supreme Court's guidance in *People v. Breverman* (1998) 19 Cal.4th 142, 153-154 (*Breverman*): "Appellate review under *Watson* . . . focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and

9

the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, at p. 177.)

We conclude that overwhelming circumstantial evidence supported Larson's conviction. Larson placed himself at the restaurant just minutes before the crime occurred, relating in a jailhouse conversation that he saw Huggins there. He recalled Huggins had testified against him. Larson asked directions to Huggins's tent, and threw a rock in the tent, hitting Meza. Afterwards, Meza saw Larson fight with Huggins. Huggins told the first responders that he was hit with a rock. The jury was instructed regarding adoptive admissions, which was relevant for Larson's reaction to the detective's statement that Larson was suspected of having caused severe injuries to Huggins; Larson did not deny the claim but remained silent. As noted, the testimony on critical matters was corroborated by Larson's phone records and images from surveillance cameras located at the restaurant and the condominium.

By contrast, the evidence assertedly implicating Lucas was weak. At trial, the defense premised its case on Lucas having visited the canyon around the time of the crime. The defendant argues the same on appeal, pointing out that one juror had asked about Lucas's whereabouts around the time of the incident. However, that question came before jury deliberation, and the jury did not renew it. Further, the jury heard Lucas testify that he was mistaken about the date he went to see Huggins, and that in fact he did not go to the canyon on the day of the crime. Lucas testified he did not kill Huggins. The jury was able to evaluate Lucas's demeanor and credibility, and by its verdict elected

10

to believe him. Thus even if we were to assume some error, on this record, it is not reasonably probable that the jury would have reached a result more favorable to Larson absent the exclusion of the challenged testimony regarding the sale of HIV medications.

II.

Larson contends the court prejudicially erred by declining his request that it instruct the jury regarding involuntary manslaughter.

A. *Background*

In proceedings outside of the presence of the jury, Larson's counsel argued for an instruction regarding involuntary manslaughter: "The evidence hasn't clearly depicted exactly what happened in the canyon and by who. There's no witness that actually sees anybody hit Mr. Huggins in the head with a rock. And it's certainly possible that the jury could conclude that he was hit in the head with a rock. But not necessarily with the intent to kill. Maybe injured by punches, maybe by falling on a collapsed tent and injuring his head. These could all rise to the level of criminal negligence without rising to the level of, necessarily, the intent to kill. [¶] . . . [¶] It's certainly possible that if the jury concludes that there was a strike in the head with a rock, that it wasn't with intent to kill, but it was with disregard for human life and indifference to the consequences. They could also conclude that when the men collapsed on the tent, there was a head injury as a result of this fighting, this indifference to the consequence of . . . the fight and injury as sustained to Mr. Huggins' head, and as a result, he later passes away."

The prosecutor opposed the instruction, pointing out the defense theory was someone else, not Larson, had killed Huggins. The prosecutor further argued substantial

11

evidence was presented from the first responders and others who testified Huggins had said he was hit with a rock. Also, the evidence showed Larson had planned the attack on Huggins and had a motive for doing so, namely, in retaliation for Huggins's trial testimony against Larson.

The court agreed with the prosecutor and declined to instruct the jury regarding involuntary murder, ruling that the evidence did not support that instruction.

B. *Applicable Law*

"California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Murder is the unlawful killing of a human being "with malice aforethought." (§ 187, subd. (a); *People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*); *People v. Blakeley* (2000) 23 Cal.4th 82, 87 (*Blakeley*).) Express malice is an unlawful intent to kill. (§ 188.) Malice is express "when the defendant manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.' " (*Blakeley*, at p. 87.) "Implied malice" requires a defendant's awareness of engaging in conduct that endangers the life of another. (*Knoller*, at p. 143.) "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Ibid.*)

Manslaughter is the "unlawful killing of a human being without malice." (§ 192; *Blakeley*, *supra*, 23 Cal.4th at p. 87.) A defendant who commits an intentional and

unlawful killing but who lacks malice is guilty of voluntary manslaughter. (See *Breverman*, *supra*, 19 Cal.4th at pp. 153-154.) However, a specific intent to kill is not a necessary element of manslaughter. (*Blakeley*, at pp. 88-89.) Involuntary manslaughter is the unlawful killing of a human being without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Involuntary manslaughter based on "an unlawful act, not amounting to felony"—a killing resulting from the commission of a misdemeanor—requires proof not only that the defendant acted with general criminal intent but also that the predicate misdemeanor was dangerous to human life under the circumstances of its commission. (*People v. Cox* (2000) 23 Cal.4th 665, 667, 675-676; *People v. Wells* (1996) 12 Cal.4th 979, 982.) Involuntary manslaughter based on the commission of a lawful act that might produce death "without due caution and circumspection" requires proof of criminal negligence—that is, "aggravated, culpable, gross, or reckless" conduct that creates a high risk of death or great bodily injury and that evidences a disregard for human life or indifference to the consequences of the conduct. (See *People v. Penny* (1955) 44 Cal.2d 861, 879; *People v. Evers* (1992) 10 Cal.App.4th 588, 596.)

Instructions on lesser included offenses must be given when there is substantial evidence for a jury to conclude the defendant is guilty of the lesser offense but not the charged offense. (*Breverman*, *supra*, 19 Cal.4th at p. 177.) Substantial evidence is defined for this purpose as "evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12

13

Cal.4th 186, 201, fn. 8.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman*, at p. 177.)

Here, the court instructed the jury with CALCRIM No. 520 (murder with malice aforethought) and CALCRIM No. 521 (first degree murder). During jury deliberations, in response to a jury question seeking clarification regarding second degree murder, the court further instructed the jury: "CALCRIM [Nos.] 520 and 521 set forth the elements of first degree murder. All other murders are of the second degree. [¶] To prove that the defendant is guilty of second degree murder, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person, and [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] For second degree murder there are two kinds of malice aforethought, express malice and implied malice. The definition of each is set forth in CALCRIM [No.] 520. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time."

An involuntary manslaughter instruction was not warranted under the facts of this case. An instruction on a lesser included offense is not required if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. (*People v. Kelly* (1990) 51 Cal.3d 931, 959.) A manslaughter theory requires the killing be committed without malice (*People v. Cook* (2006) 39 Cal.4th 566, 596), whereas the evidence in this case showed implied malice. As explained above, malice is implied " 'when the killing results from an intentional act, the natural consequences of which are dangerous to life,

14

which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 107 (*Lasko*); *People v. Swain* (1996) 12 Cal.4th 593, 602.)  A defendant acts with implied malice when he acts with an awareness of endangering human life.  (*Knoller*, *supra*, 41 Cal.4th at pp. 143, 153.)

A defendant's intent is rarely susceptible of direct proof, and may be inferred from the facts and circumstances surrounding the offense.  (*People v. Ramos* (2004) 121 Cal.App.4th. 1194, 1207-1208.)  Here, the jury could reasonably find Larson acted with malice based on his conduct immediately before he hit Huggins with a rock:  Larson elected to follow Huggins to the canyon.  He specifically asked for directions to Huggins's tent, and picked a fight with him, referring to Huggins as "a little piece of shit" who had testified against him.  Larson specifically asked Meza and Huggins if they knew how it felt to be hit with a rock, and proceeded to throw an eight-inch rock into the tent.  Larson also threatened to burn their tent.  In light of Larson's recognition that hitting someone with a rock would cause injury, the jury's only reasonable inference was that Larson acted with malice because he hit Huggins's head with a rock, knowing it could endanger Huggins's life.

In any event, we would conclude there was no prejudice to Larson from any instructional error.  "[W]hen a trial court violates state law by failing to properly instruct the jury on a lesser included offense, this test applies:  '[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and

15

theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*Watson*, *supra*, 46 Cal.2d at p. 836]. A conviction of the charged offense may be reversed in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred.' " (*Lasko*, *supra*, 23 Cal.4th at p. 111.)

Based on our review of the record, if the trial court erred by failing to instruct the jury regarding involuntary manslaughter, that error was harmless under *Watson*, *supra*, 46 Cal.2d 818. Our prejudice analysis set forth above applies equally here. We note that Larson concedes in his opening brief that the evidence supported his identity as Huggins's attacker: "While the defense attorney presented the best possible defense that [Lucas] was the killer, there was evidence that it was Larson who struck [Huggins] with the rock, albeit without malice or intent to kill. The [restaurant's] surveillance camera recorded Larson leaving the restaurant shortly after [Huggins] and Meza. Judy Bryant and Maurice Daniels saw Larson walk down the hill toward the campsite. Meza testified that Larson threw a rock at him inside their tent. A minute later, Meza saw Larson and [Huggins] fighting."

However, Larson argues he did not "subjectively appreciate the risk to [Huggins's] life when he struck him with the rock." As evidence of that, Larson notes that he had told Meza he was not going to hurt Huggins, but simply scare him. Also, he had told his mother by phone that he did not kill Huggins on purpose. The jury evaluated that

16

evidence regarding Larson's intent, but still convicted him of second degree murder. We may not reweigh that testimony on appeal. We conclude the jury would not likely have reached a more favorable verdict absent any instructional error.

Larson relies on Justice Kennard's concurrence in *People v. Bryant* (2013) 56 Cal.4th 959. We need not discuss that claim further because one justice's concurrence lacks precedential value. (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231.)

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.

17