Filed 2/20/14  P. v. Smith CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br><br>JORDAN SMITH,<br><br>      Defendant and Appellant. | A135500<br><br>(Contra Costa County<br>Super. Ct. No. 5-080932-7) |

**I.**

**INTRODUCTION**

Appellant was driving a car when his passenger, a gang member, shot and killed a man who was getting into a car driven by a member of a rival gang.  A jury acquitted appellant of first degree murder, but convicted him of second degree murder, with gang-related firearm use and gang enhancements, and of participating in a criminal street gang.  Appellant argues: (1) the trial court erred in failing to instruct the jury on involuntary manslaughter; (2) the gang participation conviction is not supported by substantial evidence that appellant knew of the gang's pattern of criminal activity; (3) the gang and gang-related firearm use enhancements are not supported by substantial evidence that appellant knew his passenger was a gang member; and (4) after the jury reported difficulty reaching agreement on the first degree murder charge, the trial court erred in giving the jury a supplemental instruction directing it to deliberate further.  We reject these contentions, and affirm the judgment.

1

## II.

### FACTS AND PROCEDURAL BACKGROUND

### A.  The Homicide

On April 12, 2007,[1] appellant, then age 18, borrowed a four-door silver Honda Civic (the Honda)[2] belonging to the young woman who was then his girlfriend.[3]  In the late afternoon, appellant used the Honda to travel to the Parchester Village housing project in Richmond to visit his paternal great-grandmother, as he had done three or four times a month throughout his life.  As appellant was driving away, he saw Alfred Thomas (nicknamed "Al Bundy"), whom he knew through spending time at the Parchester Village community center.[4]  Appellant's grandmother worked at the community center and used to bring him along, so he got to know other children from Parchester Village who came to the center to play games and "hang[] out."  Thomas, who was wearing a red hoodie, flagged appellant down, and appellant stopped to talk with him.

Thomas expressed a desire to spend some time with appellant, so appellant invited Thomas to accompany him on a trip to the Pittsburg-Bay Point area to visit appellant's brother and some mutual friends.  When appellant and Thomas arrived at their destination and got out of the car, appellant noticed that Thomas was carrying a handgun in his waistband.  Appellant asked what Thomas was doing with the gun, and Thomas responded, "Man, you know how it is.  Dangerous."  Appellant told Thomas he did not need a gun in Bay Point, and Thomas replied that he needed one back in Richmond.

After appellant and Thomas ended their visit to Bay Point, which was after dark, appellant drove back towards Parchester Village.  He planned to drop Thomas off there

---

[1]  All further references to dates are to the year 2007 unless otherwise noted.

[2]  Some eyewitnesses to the homicide described the car as gray or beige rather than silver, but appellant does not dispute that these witnesses were referring to the Honda.

[3]  To protect the privacy of appellant's former girlfriend, who was in a relationship with him from sometime in 2005 until shortly after the shooting, we will refer to her simply as appellant's girlfriend.

[4]  In 2009, before appellant's trial, Thomas was shot and killed.

on the way to San Francisco to return the car to his girlfriend. On the way, appellant realized he needed to stop at his maternal grandmother's in El Sobrante, where he was living at the time, to borrow her gas card so he could fill up the Honda's tank. Once that was accomplished, appellant resumed driving toward Parchester Village, taking his usual route, which went through San Pablo. Appellant had never experienced any problems while driving in that area.

Meanwhile, late that same evening, a woman named Alandria Gallon, together with Pausanias Wise, the father of Gallon's two children, drove to San Pablo in Gallon's burgundy Chevrolet (the Chevrolet). During the late evening, they spent time in San Pablo visiting with a group of friends, many of whom, including Gallon and Wise, were drinking and taking drugs.

When Gallon and Wise left the gathering sometime shortly after midnight (that is, very early in the morning of April 13), they were high on alcohol, marijuana, and Ecstasy. The Chevrolet ran out of gas near 11th and Broadway in San Pablo.[5] They gave money to a passerby to go and get gas for them, and had to wait about half an hour for the person to return. While they were waiting, Wise called his friends Raymond Adams, nicknamed "Nook Nook," and Brandon Leroy, who lived nearby, and they came to help Gallon and Wise push the car. Leroy was close to Adams, and considered him like a brother.[6]

Gallon, Wise, Adams, and Leroy stayed in the street at 11th and Broadway for some time, listening to music and talking. Another group of people, including some whom Gallon and her friends knew, gathered in the vicinity at about the same time.

Once the Chevrolet was refueled, Adams asked Gallon and Wise to give him a ride to North Richmond. Leroy argued with Adams about his intention to leave. As the

---

[5] This location is within about a quarter of a mile, or five or six blocks, from Parchester Village.

[6] Despite this close relationship with Adams, Leroy was called as a defense witness at appellant's trial. Appellant did not know Adams or Leroy before the shooting, though he had seen Leroy on the street before while driving through the area.

3

Chevrolet got ready to pull away, Wise was in the driver's seat, Gallon was in the front passenger seat, and Adams was in or near the back of the car. Leroy was standing nearby in the street, still arguing with Adams.

At about that time, the Honda arrived in the vicinity of the Chevrolet.[7] Adams had been standing half in and half out of the rear passenger area of the Chevrolet, and it is not clear from the record whether he got all the way into the car, or whether it actually started moving, before the Honda arrived. At any rate, according to Leroy, when the Honda approached, Adams said, "Who is that?" Adams then pulled out a gun and pointed it at the Honda, though he did not fire it.

Between six and eight shots were then fired from the Honda in the direction of the Chevrolet. At least one of them hit Adams in the head. The Honda then took off, heading at high speed in the direction of Parchester Village.[8]

With Gallon's help, Wise drove the car a short distance onto 12th Street, where he stopped the car, realizing that Adams had been shot. Adams either fell from the car, or was pulled out by Wise. He ended up lying in the street, bleeding from his head. Gallon called 911, and the police arrived. Adams was taken to the hospital by paramedics, and later died from the gunshot wound to his head. The police later found eight 9-millimeter shell casings, all fired by the same weapon, in the middle of the street at 11th and Broadway.

---

[7] In an interview during the afternoon of April 13, Gallon told the police that the Honda had driven past the group earlier, while they were waiting for the person to arrive with the gas. There was evidence tending to show that her recollection on this point was inaccurate. During her police interview, Gallon described the car from which the shots originated as a Ford or Buick hatchback, and said it had a bicycle rack on top, when it was actually a Honda sedan that did not have a bicycle rack. Leroy also told police at the time that the Honda had passed by the area of 11th and Broadway at some point before the shooting, but he testified at appellant's trial that he only said this because he had heard it from other people. Appellant denied that he had driven past the area that night before the shooting.

[8] Appellant testified that he headed for Parchester Village after the shooting because he just wanted to get away from the scene and get out of his car, and his great-grandmother's house was the only place nearby that he could go.

4

One of the key contested issues at appellant's trial was the identity of the shooter. The prosecution's theory was that appellant fired the shots, but appellant testified that it was Thomas. In his trial testimony, appellant gave the following version of the events: When appellant approached the area of 11th and Broadway, he slowed down because there were people in the street; at that point, appellant also saw three or four people standing next to a burgundy car (i.e., the Chevrolet), apparently speaking with its driver. As appellant drove nearer, one of the people broke off from the group he was with and started to cross the street in front of the Honda, so appellant slowed down, and then stopped altogether. Suddenly, Thomas yelled "Watch out!" and leaned from the passenger seat across appellant, holding his gun in his hand. Appellant ducked back, and Thomas fired out the driver's side. From the time Thomas yelled until he fired his gun was only a split second.

Appellant was "startle[d]," "shocked," and "blind-sided" by the fact that Thomas had fired the gun, and yelled at him for doing so. Thomas yelled to appellant that he had seen someone with a gun, but appellant had been watching the person cross in front of the Honda, so he was not looking in the direction of the Chevrolet, and did not see anyone with a gun. Appellant saw the Chevrolet and the silhouettes of its driver and front seat passenger, but he did not look at the back seat, and did not recognize Gallon as the passenger. He did not know what or whom Thomas was shooting at, and Thomas did not tell appellant anything about the neighborhood or gang affiliation of the person with the gun Thomas saw. As appellant sped away, he saw in his side mirror that the Chevrolet was leaving the scene in the opposite direction and making a sharp turn.

Appellant's testimony that Thomas was the shooter was consistent with that of other witnesses, including Leroy, who testified that the shooter was in the passenger seat, was wearing a red hat or hoodie,[9] and fired across the driver, who ducked out of the way. Leroy did not see either person's face. Shortly after the shooting, Leroy identified a

---

[9] Appellant testified that at the time of the shooting, Thomas was wearing his red hoodie, and appellant was wearing a black coat and a Boston Red Sox hat, blue with a red and white letter B on it.

photograph of appellant in a photo lineup, telling the police that on several occasions before the night of the shooting, he had seen the person depicted in the photograph driving the Honda in the area where the shooting occurred, and that the driver on the night of the shooting was the same person. After appellant was arrested, however, Leroy told the police that he had not gotten a very good look at the driver on the night of the shooting. In any event, Leroy reiterated at trial that the shooter was the Honda's passenger, not the driver, and added that the person had aimed at him as well.

Shortly after the shooting, appellant told his girlfriend that he had been shot at while driving her car, and had shot back at the person responsible. She later testified to that effect before the grand jury. At trial, appellant testified that he hid the truth about the shooter's identity from his girlfriend because he did not want her to tell the police that Thomas was the shooter, which would have put her in danger of being retaliated against by Thomas's friends and family. Appellant denied shooting Adams, and denied that he committed the shooting in order to gain credibility and respect in his gang.

Other than appellant's girlfriend's statements about what appellant told her, the only evidence that appellant was the shooter consisted of Gallon's statements to the police during her interview on April 13. A videotape of this interview, which lasted about an hour and 20 minutes, was shown to the jury at trial.[10] Gallon and appellant knew one another, because they had gone to high school together, along with Wise, at North Campus Continuation School in Richmond. When Gallon spoke with the police, she told them appellant had shot Adams. She said she had seen and recognized him at the time, and described him as having been wearing a grey jacket that she remembered him wearing in high school, with a red and white shirt underneath, and a red hat with a white logo on it. She also identified appellant's photograph.

In her subsequent grand jury testimony, however, Gallon said that she did not see who fired the shots, and did not know whether appellant was the shooter. Moreover,

---

[10] In addition, portions of Gallon's grand jury testimony were read to the jury.

6

even in some portions of her police interview, it was unclear whether Gallon was identifying the shooter as the passenger or the driver of the Honda.

At trial, Gallon and Leroy both testified that Gallon took marijuana and Ecstasy on the night of the shooting, and Gallon insisted that because she was high on drugs, she did not remember much about what happened. She also did not remember identifying appellant as the shooter, or anything else she said in her police interview the following afternoon. Gallon testified before the grand jury that she was also high during her police interview, having consumed Ecstasy, marijuana, and Vicodin, and that she told the police about her condition. The officers who interviewed Gallon disputed this, stating that she did not seem to them to be under the influence of any substance at the time. They did not do any tests to verify this, however, and they acknowledged that her speech was very rapid.

Evidence was introduced that Gallon had tried to retract her statement about two months after the shooting, and that she testified before the grand jury that someone had offered her $1,500 not to come to court. At trial, Gallon said she did not remember either of these events.

The police located and arrested appellant on April 26, 2007. Appellant told the police that he was not present at the scene of the shooting and did not have access to a car, but admitted at trial that this was a lie.

Recordings of several telephone calls that appellant made from jail after appellant was arrested were played for the jury. In one call, appellant reproached his girlfriend for talking to the police, and asked her to tell the police she had lied when she told them appellant had driven her car that night.

### B. Gang Evidence

#### 1. Expert Testimony

The prosecution presented two expert witnesses on criminal street gangs in Contra Costa County: Shawn Pate, an investigator with the Contra Costa County District Attorney's office, and Stephen Purcell, a Richmond police officer whose current

assignment included supervising gang members who were on parole in the Richmond area.

Pate testified about two sets of gangs in the Richmond area. The first set consisted of the North Richmond Project Trojans, about whom Pate was particularly knowledgeable, and their allies in South Richmond, the Easter Hill Boys. The second set—rivals of the first—consisted of the Central Richmond or "Deep C" gang and their allies, the Parchester Villains.

Pate and Purcell both testified that the North Richmond territory, which was small and isolated, with only a few access routes, was closely monitored by the Project Trojans, so that gang members would be immediately alerted to the presence of law enforcement officers or rival gang members. Pate explained that territorial control was very important to the Project Trojans, because their primary activity was selling narcotics.

Acts of violence against members of rival gangs were an integral part of the behavior of all of the gangs in the area, particularly among younger members. Committing acts of violence enables a gang member to gain respect in Richmond gangs, and shooting a rival gang member who is a "revenue maker" would increase that respect. Gang members also commit violence against persons who are labeled "snitches" because they have given information about gang-related crimes to police. Purcell opined that if a person who was a "strong associate" of a gang committed a murder or shooting, he would then consider that person to be an "active participant" in the gang.

Pate testified that Wise sold drugs in North Richmond, and was a member or "strong associate" of the Project Trojans. Wise's friend Leroy was also involved with a subset of the North Richmond gang. Pate and Purcell both opined that a North Richmond or Project Trojans member would be vulnerable if he ran out of gas at 11th and Broadway, which was outside North Richmond territory and close to Parchester Village, and had to wait there on the street for 30 minutes to an hour. They explained that gang members use the term "slipping" to refer to being caught outside one's territory or with one's guard down, and that in order to avoid being "caught slipping," gang members prefer to be armed when outside their territory. They also testified that if a North

8

Richmond gang member such as Wise were shot by a member of the Parchester Villains, that shooting would benefit the Parchester Villains gang by eliminating a rival and increasing the gang's level of respect and credibility. Purcell added that it would benefit the shooter as well, by garnering him increased respect within the gang.

Purcell's area of particular expertise was the Parchester Village project; he had patrolled in the area for several years, and his father had also patrolled there for 10 years while serving as a Richmond police officer. Purcell identified the Parchester Villains as the longstanding dominant gang in Parchester Village. Purcell's father had recognized their existence as a "disruptive group" in the 1990's; he did not identify them as a gang, but Purcell explained that at the time, the laws defining such criminal groups as gangs had not yet been enacted.

Purcell testified that the Parchester Villains had about 30 members as of April 2007, most (but not all) of whom lived in Parchester Village. The primary activity of the Parchester Villains was selling rock cocaine, methamphetamine, and marijuana. Territory is significant in gang culture in Richmond because it defines the area within which the gang has the exclusive right to deal drugs. Purcell had observed one instance, around 2007, of graffiti in the form of a "PV," which he believed was intended to mark the location as Parchester Villains territory.

Purcell apparently considered the North Richmond and Project Trojan gangs to be a single entity. Purcell, like Pate, believed that in 2007, the North Richmond and Project Trojan gangs were rivals of the Parchester Villains, and that the Central Richmond or "Deep C" gang was an ally of the Parchester Villains. A man whom Purcell believed was a Parchester Villains member had been killed in a retaliatory shooting by North Richmond in 2005. A North Richmond gang member would be vulnerable outside the gang's geographic area. The intersection of 11th and Broadway is in Parchester Villains territory.

According to Purcell, the Parchester Villains did not have a gang color, but they were associated with hats bearing the insignia of the Pittsburgh Pirates or the

9

Philadelphia Phillies.[11]  The Parchester Villains' allies, the Central Richmond gang, were associated with Cincinnati Reds caps, and those caps might also be worn by Parchester members.

Purcell named about a dozen individuals whom he believed were active members of the Parchester Villains, or at least strong associates, during the period from 2005 to 2007.  Appellant's friend Thomas, whom appellant testified shot Adams, was one of them.  Another was Terrain Miller, who was in prison at the time of appellant's trial as a result of his involvement in a retaliatory shooting carried out on behalf of the Parchester Villains.

Purcell also named Terrell Edwards (nicknamed "Wig") as a Parchester Villain.  Edwards was killed in 2005 in a retaliatory shooting by a North Richmond gang member.  In addition, Deaundre Alexander, whom Purcell was supervising as a gang-related parolee, was a Parchester Villains member or associate.  In appellant's testimony, he acknowledged that he knew both Edwards and Alexander from school and from the Parchester Village community center.

On cross-examination, Purcell acknowledged that no members of the Parchester Villains had identified themselves as such to Purcell personally, and that no one from Parchester Village had told him there was a gang called the Parchester Villains.  However, Purcell cited instances of Parchester Villains members identifying themselves as such to other law enforcement officers or in court proceedings.  Purcell was aware that the president of the Parchester Village Neighborhood Council did not believe the gang existed.  Purcell also acknowledged that he had never seen any graffiti or tattoos that spelled out the name Parchester Villains.

Despite his extensive contacts with Parchester Village residents and Parchester Villains gang members, Purcell had not been familiar with appellant before the night Adams was shot.  Unlike all of the other people whom Purcell believed were members of

---

[11]  A photograph of Thomas wearing a Pittsburgh Pirates hat was admitted into evidence at trial.

the Parchester Villains gang, Purcell had never seen appellant in Parchester Village. Purcell had seen numerous references to Parchester Villains gang members on social media sites, and none of these references mentioned appellant by name.

Nonetheless, Purcell believed that appellant was a "strong associate" of the Parchester Villains, although before the shooting he was not an "active participant," in the sense in which "actively participates" is used in Penal Code section 186.22, subdivision (a).[12] This opinion was based on a number of circumstances, including the telephone calls appellant made from jail; his relationship with gang members in Parchester Village; Gallon's testimony that appellant "claimed" Parchester, as well as the fact that appellant's father lived in Parchester Village; and the photographs of appellant in which he was shown making hand signs that Purcell opined were a variation of the "PV" sign associated with the Parchester Villains, albeit in an atypical form. Purcell acknowledged, however, that people who lived in Parchester Village but were not gang members, including young children, sometimes made the "PV" hand sign.

### 2. Other Evidence on Gang Allegations

The prosecution produced documentary evidence that Donzell Ashford and Orlando Griffin, who were identified by Purcell as members of the Parchester Villains, had each separately been convicted of predicate crimes (assault with a firearm (§ 245, subd. (a)(2)) and robbery (§§ 211, 212), respectively) for the purpose of establishing a pattern of criminal gang activity under section 186.22, subdivisions (e)(1) and (e)(2). The parties stipulated that appellant's friend Deaundre Alexander pleaded guilty in January 2007 to possession of cocaine base for sale, in violation of Health and Safety Code section 11351.5, with the offense having occurred in April 2006. Under section 186.22, subdivision (e)(4), this was also a predicate crime for the purpose of establishing a pattern of criminal gang activity.

The trial court also took judicial notice of court records establishing that two other individuals identified by Purcell as Parchester Villains members, Larry Dorton and

---

[12] All further statutory references are to the Penal Code unless otherwise noted.

11

Terrain Miller, had pled guilty to various charges, including gang enhancements under section 186.22, subdivision (b)(1)(B), that stemmed from their association with the Parchester Villains. In both instances, the charged crimes occurred in North Richmond on December 19, 2006. The prosecution offered these records for the purpose of corroborating the basis for Purcell's opinion that the Parchester Villains gang existed.

Gallon testified before the grand jury that appellant "claimed" Parchester Village when she knew him in high school. At trial, however, Gallon did not recall giving that testimony, nor did she recall whether or not she had ever heard appellant make such a "claim." Appellant denied being involved with gangs. He explained he told people at North Campus high school that he was from Parchester Village rather than El Sobrante because he wanted to fit in; it was "not considered cool to be from El Sobrante," so he said he was from Parchester Village because his father and other family members lived there.

When the police searched the home where appellant lived with his grandmother, they found photographs of appellant making hand gestures[13] and wearing a predominantly red baseball cap backwards. A red Cincinnati Reds baseball cap was found at the home of appellant's great-grandmother in Parchester Village, where appellant's father lived, along with some of his other adult relatives on his father's side. However, appellant had never lived there, and did not have much to do with his father. During her relationship with appellant, his girlfriend never saw appellant wear a red hat, or a baseball cap with a "P" on it, nor did she see any such items in the bedrooms appellant used at his mother's and grandmother's respective homes.

Appellant acknowledged he knew how to make the "PV" hand gesture depicted in the photographs of him, but said that this was common knowledge, and the sign stood for Parchester Village, not for the Parchester Villains. He also knew how to make a hand sign associated with the street where his mother lived. Such signs were common among

---

[13] These were the photographed hand gestures that Purcell identified as Parchester Village gang signs.

young African American men, including ones who were not gang members, as a way of identifying their neighborhood.

Appellant testified that not only was he not a member of the Parchester Villains, he had never even heard of them.  Appellant was raised by his maternal grandmother and his mother, first in El Sobrante and later in Pittsburg and Bay Point.  At the time of the shooting, he lived with his grandmother in Pittsburg and his mother in Bay Point, going back and forth between their two homes.  Most of his friends lived in that area.  Appellant's girlfriend corroborated this, testifying that the friends of appellant's whom she knew were from Pittsburg and Bay Point, and that during their four-year relationship, she only accompanied appellant to Parchester Village a handful of times, and then only to visit his great-grandmother (whom she referred to as his grandmother) or his father.

During one of his telephone calls from jail after his arrest, appellant used the term "back street," which Purcell said was the name of a South Richmond gang, and also used the names of three individuals whom Purcell identified as gang members.  During that call, appellant also referred to a fellow jail inmate as possibly "[having] a problem with the villain," and said he thought the inmate suspected appellant might be a "village nigger."  In another call, appellant said he had seen some "northers" in a jail holding facility.

### C.  Trial Court Proceedings

The grand jury indicted appellant on two substantive charges: count one, murder (§ 187), and count two, active participation in a criminal street gang (§ 186.22, subd. (a)).  The indictment included two enhancements on the murder charge.  The first (the gang-related firearm use enhancement) alleged that appellant, as a principal in the offense, used and intentionally discharged a firearm, causing great bodily injury and death to a non-accomplice, and that the murder was committed for the benefit of and at the direction of a criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by gang members.  (§§ 12022.53, subds. (b), (c), (d), (e)(1); 186.22, subd. (b)(1).)  The second (the gang enhancement) alleged that the murder was committed for the benefit of and at the direction of a criminal street gang, with the

13

specific intent to promote, further, and assist in criminal conduct by gang members
(§ 186.22, subd. (b)(1)).

The jury found appellant not guilty of first degree murder, but guilty of second
degree murder as a lesser included offense. The jury also found true the allegation in the
gang-related firearm use enhancement that in the commission of the murder, *a principal
party* used and intentionally discharged a firearm, causing Adams's death, and did so for
the benefit of a criminal street gang. (See § 12022.53, subds. (d), (e)(1)(A), (e)(1)(B).)
In addition, the jury both returned a true finding on the gang enhancement allegation, and
found appellant guilty on count two (active participation in a street gang, as defined in
§ 186.22, subd. (a)). In accordance with the instructions on the verdict forms, the jury
did *not* return a finding either way on the allegation that *appellant* personally used a
firearm in connection with the murder.

Appellant was sentenced to a total term of 40 years to life for second degree
murder and the gang-related firearm use enhancement, with the sentences on both the
gang participation charge and the gang enhancement stayed under section 654. This
timely appeal ensued.

## III.

### DISCUSSION

### A. Failure to Instruct on Involuntary Manslaughter

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.)
When such a killing occurs "in the commission of an unlawful act, not amounting to
felony," it is involuntary manslaughter. (§ 192, subd. (b).) This type of homicide is
commonly referred to as misdemeanor manslaughter. " 'If the evidence presents a
material issue of whether a killing was committed without malice, and if there is
substantial evidence the defendant committed involuntary manslaughter, failing to
instruct on involuntary manslaughter would violate the defendant's constitutional right to
have the jury determine every material issue.' [Citation.]" (*People v. Abilez* (2007) 41
Cal.4th 472, 515.) A defendant's own testimony can be sufficient evidence to justify an
instruction, and doubts about the sufficiency of the evidence to warrant an instruction

14

should be resolved in the defendant's favor. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

At trial, appellant requested a misdemeanor manslaughter instruction on the theory that the homicide occurred in the course of a violation of former section 12025, subsection (a)(3), which has since been recodified as section 25400, subsection (a)(3).[14] Former section 12025, subdivision (a)(3) made it a crime to "[c]ause[] to be carried concealed within any vehicle in which [the defendant] is an occupant any pistol, revolver, or other firearm capable of being concealed upon the person." Appellant's theory at trial, which he reiterates on appeal, was that he committed this crime by permitting Thomas to enter his car, knowing that Thomas was carrying a concealed gun. The trial court declined to give an involuntary manslaughter instruction.

On appeal, respondent notes that former section 12025, subdivision (a)(3) was a wobbler, and argues that a wobbler cannot constitute the basis for a misdemeanor manslaughter instruction. In support of this contention, respondent cites *People v. Morse* (1992) 2 Cal.App.4th 620, 647, which held that a wobbler is a felony for all purposes unless and until it is validly reduced to a misdemeanor. We agree with respondent on this point. (See *People v. Banks* (1959) 53 Cal.2d 370, 382, fn. 7 ["In a homicide prosecution, evidence that the killing was in the perpetration of [a wobbler] supports a determination that the homicide was second degree murder in the perpetration of a felony."], superseded by statute on another point as stated in *People v. Park* (2013) 56 Cal.4th 782, 792–793.) Accordingly, the trial court did not err in declining to give an involuntary manslaughter instruction based on appellant's violation of former section 12025, subdivision (a)(3).

---

[14] In 2010, after the crimes at issue in the present case were committed, the Legislature "reorganize [d] without substantive change the provisions of the Penal Code relating to deadly weapons." (Legis. Counsel's Dig., Sen. Bill No. 1080, 10 Stats. 2010 (2009–2010 Reg. Sess.) Summary Dig., pp. 4137–4138.) The new statutes became operative January 1, 2012. All further references to former Penal Code sections are to these statutes as they read before the reorganization.

15

On appeal, appellant presents two alternative arguments why an involuntary manslaughter instruction should have been given. First, he argues that an involuntary manslaughter instruction must be given in *all* homicide cases in which there is substantial evidence that the defendant did not form the intent to kill. Second, appellant identifies, for the first time, two other misdemeanors that he now contends could have served as the basis for a misdemeanor manslaughter instruction.

As to his first contention, appellant quotes *People v. Rogers* (2006) 39 Cal.4th 826 for the proposition that "[a]n instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill." (*Id.* at p. 884.) Appellant has taken this quotation out of context, however.

In *People v. Rogers*, *supra*, 39 Cal.4th 826, the evidence would have justified the jury in finding either that the defendant intended to kill the victim, or that he did not so intend. (See *id.* at pp. 867, 870–871.) The trial court gave instructions on implied malice second degree murder and heat-of-passion voluntary manslaughter, but the jury convicted the defendant of premeditated first degree murder. In the part of the opinion containing the passage quoted by appellant, the Supreme Court concluded that even if the jury should have been instructed on involuntary manslaughter, the error was harmless beyond a reasonable doubt in light of the jury's clear finding that the killing was intentional.

In short, *People v. Rogers*, *supra*, 39 Cal.4th 826, did not involve the issue before us in this case, which is whether an involuntary manslaughter instruction must be given sua sponte in a case where there is substantial evidence that the killing was unintentional, but *other* elements of involuntary manslaughter are not supported by the evidence. " 'It is axiomatic that cases are not authority for propositions not considered.' [Citation.] 'The holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 684.) Thus, notwithstanding the language from *People v. Rogers* on which appellant relies, the law does not require an involuntary manslaughter instruction in every case in which substantial evidence supports a finding that a killing was unintended.

16

Appellant also relies on *People v. Cook* (2006) 39 Cal.4th 566, in which the Supreme Court stated: "If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue. [Citation.]" (*Id.* at p. 596.) This statement was dictum, because the court held that the instruction was not required given the evidence conclusively showing that the defendant had brutally beaten his victim to death. More significantly for our purposes, the court also noted that "the jury could not have found that defendant committed a mere misdemeanor battery by administering that beating." (*Ibid.*) Thus, *People v. Cook* is consistent with the rule that involuntary manslaughter must be predicated on the commission of a misdemeanor.[15]

The correct rule regarding the issue presented here is exemplified by the facts and holding in *People v. Cox* (2000) 23 Cal.4th 665, 675, criticized on another ground by *People v. McCall* (2004) 32 Cal.4th 175, 187, fn. 14. In *People v. Cox*, the defendant got into an argument with another man, whom he slapped and then punched on the side of the head. The victim fell down and lost consciousness, but revived in a few minutes, and was able to leave the scene with the assistance of another person. The following

---

[15] In a letter sent to this court after the completion of briefing, appellant cites the Supreme Court's recent decision in *People v. Bryant* (2013) 56 Cal.4th 959. In that case, appellant points out, the Supreme Court stated (in dictum, and in a concurring opinion by Justice Kennard) that a killing without malice, in the commission of a felony that is *not* inherently dangerous, can constitute involuntary manslaughter if committed without due caution and circumspection. (*Id.* at p. 966; see *id.* at pp. 970–971; see also *id.* at pp. 971–974 (conc. opn.).) This is not "new law." Rather, in making this statement, the court relied on a much older case, *People v. Burroughs* (1984) 35 Cal.3d 824, overruled on another ground by *People v. Lasko* (2000) 23 Cal.4th 101 and *People v. Blakeley* (2000) 23 Cal.4th 82. (*People v. Bryant*, *supra*, 56 Cal.4th at pp. 966–967.) Thus, if appellant wanted to request an involuntary manslaughter instruction based on *People v. Burroughs*, he could have, and should have, done so at trial. He did not do so in the trial court, nor did he address the issue in his opening brief on appeal. We therefore decline to consider this issue.

17

morning, however, the victim could not be roused from sleep, and he died later the same day of a skull fracture and subdural hematoma. (23 Cal.4th at pp. 667–669.)

The prosecution in *People v. Cox*, *supra*, apparently did not contend that the defendant intended the victim's death, because the defendant was charged only with involuntary manslaughter. The basis for the charge was that the defendant had committed misdemeanor battery on the victim. (23 Cal.4th at pp. 667–668.) The trial court instructed the jury that "as a matter of law, battery is an inherently dangerous offense and therefore a predicate for involuntary manslaughter without any further proof regarding the circumstances surrounding commission of that underlying misdemeanor." (*People v. Cox*, *supra*, 23 Cal.4th at p. 669.) The California Supreme Court reversed, holding that the trial court erred in instructing the jury that misdemeanor battery is inherently dangerous as a matter of law, because it can be committed by only a slight touching.

The court further held that "where involuntary manslaughter is predicated on an unlawful act constituting a misdemeanor, it must still be shown that such misdemeanor was dangerous to human life or safety under the circumstances of its commission." (*People v. Cox*, *supra*, 23 Cal.4th at p. 675.) Accordingly, the Court disapproved earlier cases adopting "a misdemeanor-manslaughter rule that automatically establishes the offense of involuntary manslaughter whenever a killing results from the commission of any misdemeanor . . . ." (*Ibid.*) Thus, *People v. Cox* is flatly inconsistent with appellant's contention that involuntary manslaughter must be charged in all homicides where there is evidence the defendant did not intend to kill. As the facts and holding in *People v. Cox* demonstrate, an unintended killing resulting from a misdemeanor that was *not* committed in a manner dangerous to human life or safety cannot properly result in a conviction of involuntary manslaughter.

Having rejected the first prong of appellant's argument, we must still consider the two additional misdemeanors that appellant identifies as potential bases for an involuntary manslaughter instruction, neither of which was argued to the trial court. The first is former section 12034, subdivision (b), now recodified as section 26100,

subdivision (b), which made it a crime for the owner or driver of a vehicle to knowingly permit another person to discharge a firearm from the vehicle. This crime was a wobbler, however, and therefore, like former section 12025(a)(3), could not serve as the basis for a misdemeanor manslaughter instruction.

The other statute on which appellant now relies is former section 12034, subdivision (a) (former section 12034(a), now recodified as section 26100, subdivision (a)). Former section 12034(a) provided that it was a misdemeanor for the driver of a motor vehicle *knowingly* to permit another person to bring a *loaded* firearm into the vehicle on a public street, in violation of former section 12031 (now recodified as section 25850). By its terms, former section 12034(a) defined a misdemeanor, and a violation of the statute could therefore serve as the basis for a misdemeanor manslaughter instruction.

Nonetheless, we do not find reversible error based on the trial judge's failure to instruct the jury on this theory in the present case, for several reasons.[16] First, former section 12034(a) is not violated unless the owner or driver *knew* that the gun was loaded when it was brought into the vehicle. Here, there was no direct evidence that appellant had such knowledge, and appellant's own testimony about his surprise when Thomas fired the gun tended to indicate that he did *not* know it was loaded. Thus, it is not entirely clear from the record that there was sufficient evidence of a violation of former section 12034(a) on appellant's part to warrant a misdemeanor manslaughter instruction based on that statute.

---

[16] Because we find no reversible error, we need not consider whether the issue was forfeited due to appellant's trial counsel's failure to cite former section 12034(a) as a basis for giving a misdemeanor manslaughter instruction. We recognize that normally, if a lesser included offense instruction is warranted on any theory, the trial judge is obligated to give it sua sponte. (See *People v. Rogers*, *supra*, 39 Cal.4th at pp. 866–867; *People v. Blair* (2005) 36 Cal.4th 686, 744–745.) Nonetheless, when, as occurred here, a defendant's trial counsel cites one or more specific statutes as the basis for a misdemeanor manslaughter instruction, and the trial judge concludes that the cited statutes are not a proper basis for the instruction, we do not believe the judge is required to comb the Penal Code in search of an alternative statutory basis for the instruction.

Second, "where involuntary manslaughter is predicated on an unlawful act constituting a misdemeanor, it must still be shown that such misdemeanor was dangerous to human life or safety under the circumstances of its commission." (*People v. Cox*, *supra*, 23 Cal.4th at p. 675.) Appellant argues that even permitting a passenger to bring a loaded gun into one's car is inherently dangerous to human life or safety. Alternatively, he argues that this act was dangerous in the circumstances of this case, where the evidence showed that Thomas was associated with a gang, and that appellant drove Thomas into the territory of a rival gang.

Even if we were to accept this argument, however, we would still conclude that the instruction was not warranted in this case. "Involuntary manslaughter, like other forms of homicide, . . . requires a showing that the defendant's conduct proximately caused the victim's death. [Citations.]" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1009, citing *People v. Sanchez* (2001) 26 Cal.4th 834, 845; *People v. Brady* (2005) 129 Cal.App.4th 1314, 1324.) "Further, proximate causation requires that the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather than a remote consequence that is so insignificant or theoretical that it cannot properly be regarded as a substantial factor in bringing about the death. [Citations.]" (*People v. Butler*, *supra*, 187 Cal.App.4th at pp. 1009–1010.) Proximate cause is generally an issue for the jury, but it is negated as a matter of law if " ' "undisputed evidence . . . reveal[s] a cause so remote that . . . no rational trier of fact could find the needed nexus." ' [Citation.]" (*People v. Butler*, *supra*, 187 Cal.App.4th at pp. 1009–1010, quoting *People v. Brady*, *supra*, 129 Cal.App.4th at p. 1326.)

In the case before us, the trial court's refusal to give a misdemeanor manslaughter instruction on this theory was based in part on its express finding that appellant had not shown the requisite causal nexus between his allowing Thomas into the car with the gun and the subsequent homicide. This finding is supported by appellant's own testimony that he was startled, shocked, and blindsided when Thomas pulled out the gun and fired it. This testimony provides substantial evidence to support the trial court's finding that Thomas's shooting of Adams was not a foreseeable result of appellant's merely having

20

permitted Thomas to enter the car with the gun. Accordingly, we concur with the trial court that in the present case, no rational trier of fact could have found that appellant's putative misdemeanor was a proximate cause of Adams's death. Thus, the evidence did not warrant the requested instruction.

In any event, if there was any error in failing to give a misdemeanor manslaughter instruction, it was harmless beyond a reasonable doubt in light of the jury's verdict, taken as a whole. The instructions made clear that the gang-related firearm use allegation, the gang enhancement, and the gang participation count all required that appellant *personally* must have acted with the *specific intent* to assist, further, or promote criminal conduct by gang members. Accordingly, because the jury returned a true finding on these allegations, the jury must have found either that appellant himself was the shooter, or (more likely) that he acted with the specific intent to assist, further, or promote Thomas's criminal conduct in shooting Adams.

The jury was also instructed, in the language of CALCRIM No. 401, that in order to find appellant guilty on an aiding and abetting theory, it had to find that appellant "knew that [Thomas] intended to commit the crime" and that appellant "intended to aid and abet [Thomas] in committing the crime." " 'To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] . . . [W]hen the charged offense and the intended offense—murder or attempted murder— are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, [this means] that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118, original italics, fn. omitted.) Therefore, the finding that appellant was an aider and

abettor, in turn, precludes a finding that he did not harbor the necessary mens rea for murder.

Accordingly, as the foregoing discussion demonstrates, the jury's verdicts on the enhancements and the gang participation count are fundamentally inconsistent with the proposition that from appellant's perspective, the killing of Thomas was unintentional. That being the case, there is no reasonable possibility that the jury, if given the option to do so, would have returned a verdict of involuntary manslaughter instead of second degree murder. Accordingly, any error in the trial court's failure to instruct on the misdemeanor manslaughter theory was harmless beyond a reasonable doubt.

## B. Sufficiency of Evidence: Gang Participation Charge

In addition to second degree murder, appellant was convicted of a violation of section 186.22, subdivision (a) (section 186.22(a)), which defines the offense of active gang participation. Section 186.22(a) makes it a felony to participate actively in a criminal street gang "with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity," and to willfully promote, further, or assist in felonious conduct by a member of that gang. We will refer to the element of active gang participation that requires knowledge of a pattern of criminal gang activity as the knowledge element. Appellant argues that his conviction was not supported by substantial evidence of the knowledge element.[17]

Our standard of review on this issue is highly deferential. " 'In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.

---

[17] Appellant does not challenge the sufficiency of the evidence establishing the other elements of active gang participation. In any event, as outlined in respondent's brief, there was substantial evidence of each of the other elements.

[Citations.]' [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1038, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Whether we ourselves would have been convinced beyond a reasonable doubt by the evidence in the record is irrelevant; what matters is whether, viewing the evidence in the light most favorable to the prosecution, any rational jury could have been so persuaded. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.)

In arguing that there was substantial evidence supporting the jury's finding on the knowledge element, respondent relies on the following facts: (1) appellant's possession of "gang paraphernalia," including the photographs of appellant making the "PV" sign[18]; (2) appellant's having "claimed Parchester" while in high school; (3) appellant's willingness to assist a gang member in shooting a rival gangster; (4) appellant's having stated in a telephone call from jail that he might be perceived as a "village nigger"; (5) appellant's frequent visits to Parchester Village when he was young; (6) appellant's friendship with Edwards ("Wig") who was a member of the Parchester Villains[19]; (7) appellant's acknowledgement that he understood the expression "Ride 4 Wig" to refer to retaliatory shootings prompted by Edwards's death; (8) appellant's admission that he learned about Richmond culture while he attended high school in Richmond; and (9) appellant's acknowledgment that when he was in high school with Wise and Gallon, he knew Wise "claimed" North Richmond.

As appellant points out in his briefs, the trial record includes evidence that could explain many of these individual facts in a manner consistent with appellant's innocence. Indeed, appellant offered such explanations in his testimony. Under the applicable

---

[18] Respondent does not specify any "gang paraphernalia" that appellant possessed, other than the photographs. The only potential evidence of gang paraphernalia (other than the photographs) is that a Cincinnati Reds baseball cap, of the type sometimes worn by the Parchester Villains, was found at appellant's great-grandmother's and father's home, and appellant was depicted in one of the photographs wearing a red baseball cap backwards.

[19] Appellant also admitted knowing two other people identified by Purcell as Parchester Villains members: Deaundre Alexander, who was appellant's cousin, and Thomas.

standard of review, however, it is not our role to weigh the credibility of appellant's explanations against the inferences the jury could reasonably draw from the prosecution's evidence. Rather, we are limited to determining whether—if the record is viewed, and all permissible inferences are drawn, in the light most favorable to the verdict—the jury's verdict is rational. Given that standard of review, we find no basis to overturn the jury's verdict in the present case.

The jury was entitled to disbelieve appellant's protestation that he had never heard of the Parchester Villains, particularly in light of his fairly close association with Edwards, his friendship with Alexander and Thomas, the gang references he made during his telephone calls from jail, and his admitted familiarity both with Parchester Village itself and with Richmond culture generally. Indeed, appellant's protestation of ignorance was undercut by appellant's own explanation as to why he told his girlfriend that he, rather than Thomas, was the shooter. Appellant testified he was afraid that if his girlfriend told the police Thomas was the shooter, Thomas's associates would retaliate against his girlfriend violently; he also testified he was afraid to turn himself in after the shooting for the same reason. That fear justifies an inference that appellant knew of the Parchester Villains' involvement in retaliatory violence.

In addition, the jury was entitled to credit Purcell's expert opinion that appellant was a "strong associate" of the Parchester Villains. This opinion, combined with the totality of the other evidence regarding appellant's familiarity with gangs generally and members of the Parchester Villains in particular, provides substantial evidence justifying the jury's inference that appellant knew about the Parchester Villains' pattern of criminal activity.

### C. Sufficiency of Evidence: Gang and Firearm Enhancements

Two bases for sentence enhancements on the homicide charge were alleged against appellant. The first (the gang firearm enhancement) was that in connection with the homicide, a principal used and intentionally discharged a firearm, causing Adams's death, and the offense was committed for the benefit, at the direction, and in association with the Parchester Villains, with the specific intent to promote, further, or assist in

24

criminal conduct by members of the gang.  (§ 12022.53, subds. (b), (c), (d), (e)(1).)  The second (the gang benefit enhancement) was that appellant committed the homicide for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by Parchester Villains members.  (§ 186.22, subd. (b)(1).)  The jury returned true findings as to both enhancement allegations.

Possessing the specific intent to promote, further, or assist in criminal conduct by gang members is an element of both the gang firearm enhancement and the gang benefit enhancement.  "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)  Appellant contends, nonetheless, that there is insufficient evidence of the specific intent element here, in that the record does not contain substantial evidence that appellant knew, at the time of the shooting, that Thomas was a member of the Parchester Villains.

Our review of this issue is governed by the same principles discussed *ante* in connection with the active gang participation charge.  Based on the same evidence summarized in that connection, and for essentially the same reasons, we are satisfied that a rational jury could justifiably infer, despite appellant's protestations of ignorance, that appellant knew Thomas was a member of the Parchester Villains.

### D.  Propriety of Instruction Regarding Further Jury Deliberations

At appellant's trial, the jury heard evidence for six court days, ending on Thursday March 1, 2012.  The jury began deliberating the following Monday afternoon.  Near the end of the court day on Friday, March 9, 2012, the jury sent a note to the trial court stating: "We cannot agree 100% to find defendant guilty of [first] degree murder[,] and need instruction on how to proceed."  While the court was conferring with counsel about how to respond, the jury indicated that they were ready to go home for the weekend, and the judge permitted them to do so.

25

The following Monday, the trial judge met with counsel before the jury arrived, and informed them that the court intended to bring the jury into the courtroom and inquire whether the foreperson believed further deliberation would be productive and whether further instruction might aid in their deliberations. The judge indicated that in case the jury wanted further instructions, he had "drafted an instruction consistent with the *Moore* decision" (referring to *People v. Moore* (2002) 96 Cal.App.4th 1105[20]), and had given copies of the proposed instruction (the *Moore* instruction) to counsel. The prosecutor then asked the court to allow additional closing argument. Appellant's trial counsel objected to this request, and the trial court ruled that further closing argument would not be allowed.

---

[20] The instruction given in *People v. Moore*, *supra*, 96 Cal.App.4th 1105, read in pertinent part as follows: " 'Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so. [¶] It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors. [¶] In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs. You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong. [¶] Fair and effective jury deliberations require a frank and forthright exchange of views. [¶] As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment. [¶] Both the People and the defendant are entitled to the individual judgment of each juror. [¶] . . . [¶] By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations. I merely find you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.' " (*Id.* at pp. 1118–1119.)

The appellate court not only upheld this instruction as permissible, but went so far as to commend the trial judge "for fashioning such an excellent instruction." (*People v. Moore*, *supra*, 96 Cal.App.4th at p. 1122.) The instruction given in *People v. Moore* has since been cited with approval in *People v. Hinton* (2004) 121 Cal.App.4th 655, 661 and *People v. Whaley* (2007) 152 Cal.App.4th 968, 982–983.

26

After the jury was reseated, the trial court asked the foreperson whether the jury had reached a verdict on the gang participation count, and the foreperson reported that it had not. The court then asked whether further instruction and deliberations as to the homicide count could be productive, and the foreperson responded affirmatively. The court later characterized the foreperson's response as having been delivered "without hesitation." At no time did the foreperson, or any other juror, indicate in any way that the jury was hopelessly deadlocked, or that further instructions and/or deliberations would not assist the jury in reaching a verdict.

The court did not ask anything further about the status of the deliberations, and the foreperson did not volunteer any additional information. Instead, the court indicated that it was about to read an additional instruction. Before doing so, however, at the request of appellant's trial counsel, the court excused the jury again in order to review appellant's objections to the court's proposed *Moore* instruction. In response to the objections, the judge made some modifications to the wording of the proposed instruction, but adhered to his original intention to deliver it. As delivered, the *Moore* instruction was quite lengthy, comprising almost three full pages in the reporter's transcript. Less than two hours after the judge gave the *Moore* instruction, the jury returned a verdict that found appellant *not* guilty of first degree murder, but guilty of second degree murder.

Appellant now contends that the trial court erred in giving the *Moore* instruction. The basis for appellant's argument is the principles enunciated by our Supreme Court in *People v. Gainer* (1977) 19 Cal.3d 835, disapproved of in part by *People v. Valdez* (2012) 55 Cal.4th 82. In *People v. Gainer*, the Supreme Court examined the case law regarding instructions given to deadlocked juries (sometimes called "dynamite" or "Allen" charges (after *Allen v. United States* (1896) 164 U.S. 492), and identified "the two elements frequently found in such instructions . . . which raise the gravest doubts as to their propriety." (*People v. Gainer*, *supra*, 19 Cal.3d at pp. 842, 845.) The court determined that the "most questionable feature is the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views." (*Ibid.*) The second aspect of such instructions that the court identified as particularly problematic was

27

"the direction . . . that '[the jury] should consider that the case must at some time be decided.' " (*Ibid.*)

After examining the flaws in both of these parts of the instruction before it (the *Gainer* instruction), the court adopted a "judicially declared rule of criminal procedure" that "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion on the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*People v. Gainer*, *supra*, 19 Cal.3d at p. 852, fn. omitted.) Based on this rule, appellant challenges three brief portions of the lengthy *Moore* instruction given in the present case.

The disputed portions of the *Moore* instruction are as follows: (1) the admonition that "In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs"; (2) the statement that "It is your duty as jurors to deliberate with the goal of arriving at a verdict on a charge if you can do so without violence to your individual judgment"; and (3) the suggestion, given as one example of possible alternative deliberation techniques, that the jury might "wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa" in order to "enable [jurors] to better understand the other's positions."

Appellant contends the admonition to the jurors not to hesitate to reexamine their views is equivalent to the directive in the disapproved *Gainer* instruction that " 'a dissenting juror should consider whether his [or her] doubt was a reasonable one . . . .' " (*People v. Gainer*, *supra*, 19 Cal.3d at p. 845.) Appellant implicitly recognizes that the language used by the trial court in the present case was worded neutrally, rather than focusing exclusively on *dissenting* jurors like the *Gainer* instruction. Nonetheless, appellant argues it is inevitable the jury would interpret this direction as being addressed more to minority jurors than those in the majority.

We disagree. "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to

28

determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229; accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 831.) Here, farther along in the same paragraph as the language challenged by appellant, the court also instructed the jury that "each of you must decide the case for yourself" and that the jury should "deliberate with the goal of arriving at a verdict on a charge *if you can do so without violence to your individual judgment*." (Italics added.) Given the inclusion of the italicized language in the *Moore* instruction given in this case, coupled with the neutral way in which the challenged part of the instruction was phrased, we are satisfied that this aspect of the instruction, as given in this case, did not suffer from the defects identified by our Supreme Court in *People v. Gainer*, *supra*, 19 Cal.3d at page 852.

Indeed, in the more recent decision in *People v. Valdez* (2012) 55 Cal.4th 82, the Supreme Court distinguished that portion of the *Gainer* instruction from an instruction that—like the one given here—directed *both* minority *and* majority jurors to "listen to the arguments" of the other side and "reweigh [their] positions in the light of all the arguments." (*Id.* at pp. 160–161 [quoting instruction]; see *id.* at pp. 162–163 [distinguishing *People v. Gainer*]; see also *id.* at p. 163 [disapproving dictum in *People v. Gainer* prohibiting any reference to potential existence of minority and majority factions in jury].) Thus, nothing in *People v. Gainer*, *supra*, 19 Cal.3d 835, precludes a trial court from giving an instruction that *all* jurors should be willing to reexamine their views in light of the views expressed by other jurors.

In *People v. Valdez*, *supra*, 55 Cal.4th 82, the Supreme Court expressly approved an instruction that, like the *Moore* instruction here, "did not in any way single out minority jurors" and "encouraged members of both the majority and the minority . . . to 'reweigh [their] positions' in light of the 'arguments' and to 'have an open mind . . . to reevaluating.' " (*Id.* at p. 162, fn. omitted.) Here, like the Supreme Court in *People v. Valdez*, we conclude that "[v]iewing the instructions as a whole, there is little, if any, likelihood the jurors understood that the court was asking jurors in the minority to do something different from jurors in the majority." (*Id.* at p. 162, fn. 42.)

29

For much the same reasons, we reject appellant's second challenge to the *Moore* instruction, which focuses on the language telling the jury it was their duty "to deliberate with the goal of arriving at a verdict . . . if you can do so without violence to your individual judgment." Appellant analogizes this language to the portion of the disapproved *Gainer* instruction telling the jury that they "should consider that the case must sometime be decided." The rationale for disapproving that language in *People v. Gainer*, however, was that it is simply false, as a factual matter, that a jury deadlock necessarily requires a retrial. (See 19 Cal.3d at pp. 851–852.) In contrast, there is no falsehood involved in telling the jurors that it is their duty to *attempt* to reach a verdict, if they can do so without violating each juror's individual judgment.

Nor is such an admonition impermissibly coercive, because it merely asks the jurors to *try* to reach agreement if possible, without stating or implying that their failure to do so will carry negative consequences of any kind. Indeed, in *People v. Butler* (2009) 46 Cal.4th 847, 881–884, the Supreme Court declined to reverse based on the delivery of an instruction to a deadlocked jury that included the following language: "Each of you must consider the evidence for the purpose of reaching a verdict, if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. And with this view, it is your duty to decide the case, if you can conscientiously do so." (Cf. *People v. Santiago* (2009) 178 Cal.App.4th 1471, 1475–1476 [predeliberation instruction that jury should reach a verdict, if it can, is not coercive].) The challenged portion of the *Moore* instruction given in this case was no more coercive than the one given in *People v. Butler*. Indeed, its lack of coerciveness is evidenced by the fact that before the instruction was given, the jury told the judge it could not reach agreement on first degree murder, and after the instruction was given, the jury *acquitted* appellant on that charge.

Finally, appellant argues that it was reversible error to suggest to the jury that they experiment with reverse role-playing if they found it helpful. In *People v. Whaley*, *supra*, 152 Cal.App.4th 968, the court determined that a similar supplemental instruction was not improper under the rule enunciated in *People v. Gainer*, *supra*, 19 Cal.3d 835,

30

because it "applied to both the minority and majority jurors"; it was coupled with other language emphasizing the jurors' duty to use their independent judgment; and the trial court made clear that it was only a suggestion. (*Id.* at pp. 982–983.) The *Moore* instruction given here had all of the same redeeming features. We agree with the court in *People v. Whaley* that such an instruction does not violate the strictures of *People v. Gainer*. Accordingly, the trial court did not err in delivering it.[21]

## IV.

### DISPOSITION

The judgment is affirmed.

---

[21] Appellant argues that the cumulative effect of the errors he alleges warrants reversal of his conviction on due process grounds. Because we have rejected each of appellant's individual claims of error, we reject this contention as well.

31

_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
RIVERA, J.